WILLIAM PAGEL, Plaintiff-Appellee, v. DON YATES, d/b/a Reed Yates Farm, Defendant and Third-Party Plaintiff-Appellant (Dean Koeber, Third-Party Defendant).

Fourth District   Nos. 4—83—0843, 4—84—0010 cons.

Opinion filed November 21, 1984.

898

Paul D. Giamanco, of Giamanco & Wexstten, of Mt. Vernon, and Leonard J. Wojtecki, of Truemper, Ward, Hollingsworth & Wojtecki, of Aurora, for William Pagel.

Costigan & Wollrab, of Bloomington, for Don Yates.

JUSTICE TRAPP delivered the opinion of the court:

Plaintiff William Pagel sued defendant Don Yates for returning the wrong broodmare to plaintiff. The jury returned verdicts in plaintiff's favor on both a negligent and a conversion count, but the trial court held plaintiff was entitled to satisfy judgment on only one count. Defendant appeals, contending: (1) plaintiff failed to prove that he re-

ceived the wrong horse or that defendant was negligent; (2) the court erred in refusing to allow him to present extrinsic evidence for impeachment purposes; (3) the admission of testimony concerning his net worth denied him a fair trial; (4) the court abused its discretion in excluding evidence of his attempts to return the horse; (5) the evidence did not support the jury's award on the conversion count; and (6) the court improperly instructed the jury on damages under the negligence count. Plaintiff cross-appeals, asserting the trial court erred in limiting him to satisfaction on only one count.

This dispute began in February 1977, when Jerry Coleman brought two mares to Reed Yates Farm, defendant's horse-breeding farm. Coleman owned one of the mares, a trotting bred horse named Phyllis Filter. Lawrence Harvey owned the other mare, Surprise Package. Coleman signed a contract with defendant to have Phyllis Filter bred to defendant's trotting stallion, Mr. Magoo. Surprise Package was to be bred to Winter Time, a pacing bred horse.

Coleman testified he identified each mare to a boy who worked on the farm. The boy led the horses away, and Coleman went into the barn to sign the breeding contracts with Bill Scott, defendant's farm manager. Scott, however, testified he saw Coleman unload the horses. After Coleman identified the horses, Scott placed a piece of tape on the halter of each horse for identification. Later, he branded a number on the hoof of each mare. Scott testified the mare Coleman identified as Phyllis Filter was bred to Mr. Magoo, and the one identified as Surprise Package was bred to Winter Time.

On April 26, Coleman sold Phyllis Filter to Pagel. Pagel testified he was more interested in the mare's pedigree than her appearance. Thus, he bought the horse although Coleman had only pointed her out from 20 yards away. The mare was in defendant's field along with 35 to 40 other horses. That same day, Pagel told Scott he still wanted Phyllis Filter bred to Mr. Magoo. On June 18, Pagel returned to the farm to pick up his horse. Scott gave him the horse branded with Phyllis Filter's number on the hoof. Pagel thought it was the same horse Coleman had shown him. The mare, which was in foal, turned out to be Surprise Package.

Harvey failed to pay his service and board bills on Surprise Package. The mare, which defendant believed was Surprise Package, and its weanling colt were sold to defendant at a sheriff's sale on November 2, 1978. The next day, defendant applied to the United States Trotting Association (USTA) for registration certificates on the horses. The USTA registers horses by means of a number tattooed onto the horse's inner lip, but the tattoos are difficult to read. The application stated

the mare's tattoo number was 8066J. On November 4, defendant sold the mare to third-party defendant Dean Koeber for $450. Defendant also sold the colt, named Winter Mite, to Chester Hunt, for $1,000.

The USTA informed defendant that neither the mare nor the colt could be registered because the number on the application was registered to a horse named Ex Creed. Without a registration certificate, a horse cannot enter races. The USTA unsuccessfully attempted to contact Ex Creed's owners. Defendant contacted Koeber several times about the problem. Koeber told defendant the mare's tattoo number was 80663. He later told the USTA that it was 30663. On April 26, 1979, defendant offered to refund Koeber's money and repay any incidental expenses for the return of the horse. Although the parties negotiated, the mare was never returned to defendant. According to defendant, Koeber originally agreed to the offer, but in July, Koeber discovered he had Phyllis Filter and refused to return her. Koeber contended defendant never tendered the settlement money, so no exchange occurred. On August 2, a USTA tattoo technician read the number on Koeber's mare as 306AJ. The USTA identified the mare as Phyllis Filter.

Meanwhile, Pagel had been breeding Surprise Package. The mare had a second colt in 1979 and a third born in 1980. In August 1979, defendant informed Mr. Pagel that her husband had the wrong horse. Koeber and Pagel were in contact after this time, but they never discussed straightening out the matter. In 1981, Phyllis Filter fell into a well and drowned. Pagel also contacted Hunt. Pagel agreed to transfer Winter Mite to Hunt after Hunt agreed to pay Pagel 25% of the colt's winnings.

On April 28, 1980, Pagel filed suit against defendant. Defendant filed a third-party complaint against Koeber, alleging Koeber negligently caused plaintiff's damages. On October 17, 1983, the jury returned verdicts in favor of plaintiff on both a negligence and a conversion count. The jury assessed damages at $20,000 for each count. The jury also found in favor of Koeber on the third-party complaint. The trial court decided plaintiff could enforce judgment on only one of the counts.

Defendant first contends plaintiff failed to prove he received the wrong horse. Defendant maintains the only evidence proving the switch did in fact occur was plaintiff's hearsay testimony. Plaintiff testified defendant gave him the wrong mare and Koeber got Phyllis Filter. Plaintiff, however, admitted he knew only what his wife had told him after she had talked to defendant and the USTA. Defendant concludes the judgment must be reversed due to the admission of hear-

say evidence.

■■■ Error in the admission of evidence does not require reversal when there has been no prejudice or if the evidence does not materially affect the outcome. (*Bullard v. Barnes* (1983), 112 Ill. App. 3d 384, 392, 445 N.E.2d 485, 491.) The evidence at trial overwhelmingly proved plaintiff received the wrong horse. Both Mrs. Pagel and Koeber testified defendant told them the horses had been switched. Even if defendant merely relied on the USTA when he made these statements, they were admissible because it is presumed a person has made an adequate investigation when he speaks against his own interests. (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 588, 434 N.E.2d 511, 522.) Moreover, defendant himself testified he was satisfied the mare sold to Koeber was Phyllis Filter. Scott also testified the horses had been switched. Finally, defendant presented an evidence deposition of a USTA official who described the mix-up and attempts to resolve it.

Defendant next asserts plaintiff failed to prove defendant rather than Coleman was negligent. Coleman and Scott gave conflicting testimony on the cause of the switch. The credibility of the witnesses and the weight to be given their testimony are matters for the jury to consider. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 309-10, 356 N.E.2d 32, 35.

Defendant, however, contends the trial court erred in not permitting him to impeach Coleman. Coleman testified he never made a mistake when identifying horses in the past. Defendant offered the testimony of two witnesses who alleged Coleman had misidentified horses on a previous occasion. The trial court did not let the witnesses testify. Defendant asserts this evidence was crucial to his case because he premised his defense on Coleman's being responsible for the switch.

■■■ A witness may not be impeached as to collateral, irrelevant, or immaterial matters. If a party elicits such matters on cross-examination, he may not impeach the witness' answer. (*Herget National Bank v. Johnson* (1974), 21 Ill. App. 3d 1024, 1028, 316 N.E.2d 191, 194.) The test for noncollateralness is whether the facts are relevant to a material issue in the case or whether the facts are independently admissible to discredit the witness by showing bias, interest, or motive. *People v. Watkins* (1974), 23 Ill. App. 3d 1054, 1060, 320 N.E.2d 59, 65.

■■■ The trial court properly excluded the evidence. It did not demonstrate any bias, interest, or motive on Coleman's part. Nor was it relevant to a substantive issue in the case. Evidence of a person's conduct on one occasion is irrelevant to prove the person is likely to have

committed the same conduct on the occasion in issue. *Papageorgiuo v. F.W. Woolworth Co.* (1978), 66 Ill. App. 3d 873, 881, 383 N.E.2d 1346, 1353.

■ Defendant argues he was denied a fair hearing because the court allowed plaintiff to inquire into defendant's net worth. Defendant objected when plaintiff asked about the farm's net worth, but plaintiff maintained he was entitled to punitive damages under his conversion theory. The court overruled the objection, and the defendant testified his farm's net worth was $75,000 in both 1979 and 1980. At the instructions conference, plaintiff asserted proof of malice was not required to recover punitive damages for conversion. The court refused the punitive damages instruction when plaintiff could not cite any authority. The court later instructed the jury to disregard the evidence.

When only compensatory damages are recoverable, the financial conditions of the parties are irrelevant and often prejudicial. (*Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill. App. 2d 365, 376-77, 202 N.E.2d 869, 874.) Such evidence appeals to the prejudice of the jury, for presumably the jury will favor those least able to bear the loss. (*DiPaolo v. Johnson* (1973), 15 Ill. App. 3d 735, 739, 305 N.E.2d 194, 197.) If undue emphasis is placed on the irrelevant evidence, or if the jury's verdict is affected by it, then reversal is required. *McKasson v. Zimmer Manufacturing Co.* (1973), 12 Ill. App. 3d 429, 439, 299 N.E.2d 38, 45.

■ Defendant alleges plaintiff's repeated references to the irrelevant evidence during closing argument prejudiced him. Defendant, however, never objected during the argument; therefore, he waived any possible prejudicial effects. (*Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 379 N.E.2d 306.) Furthermore, we disagree with defendant's contention that plaintiff unduly emphasized the irrelevant evidence. Defendant objects to plaintiff's description of him as "a big horse breeder." Yet, defendant's own witnesses described his farm as a "large operation" and a "large breeding farm." Moreover, plaintiff was merely contending the mix-up was more likely the fault of defendant's large farm rather than his own. Defendant objects to plaintiff's reference to the "sport of kings," but plaintiff was referring to horse racing, not horse breeding. The comment was directed toward the cost of raising racehorses rather than defendant's financial condition. The same is true of counsel's statement that his clients were not "gentlemen racers, and very very rich." Although the comment alluded to plaintiff's financial condition, defendant did the same, stating "$1,000 may be just a drop in the bucket to him [plaintiff], but it is worth quite

a bit to, I would say, most of us."

Defendant argues plaintiff misled the court by asserting that he had authority for his position. We note, however, the evidence had been admitted before plaintiff ever claimed to have authority. Thus, the error had already been committed. In light of the fact that the evidence was not repeated and the court's instruction to disregard it, we conclude defendant suffered no prejudice as a result of the testimony concerning his net worth.

■ Defendant argues the trial court erred in excluding evidence from the USTA files on the case. The evidence concerned the identification of Koeber's mare as Ex Creed and attempts to locate Ex Creed's owners. Defendant contends the evidence was relevant to show the USTA helped create some of the confusion and to demonstrate his efforts to remedy the situation. The trial court stated the issue in the suit was who was responsible for the switch. The court held any after-the-fact identification was both irrelevant and confusing to the issue. We agree. Not only was the evidence collateral, but it was also cumulative because both Koeber and defendant testified about the misidentification of the mare.

■ Defendant also contends the court erred in excluding a letter from Koeber's attorney detailing expenses incurred after Koeber bought the mare. The court, however, properly excluded the letter as evidence of settlement negotiations. (*Hill v. Hiles* (1941), 309 Ill. App. 321, 32 N.E.2d 933.) Again, both Koeber and defendant were allowed to testify as to the negotiations between them.

■ Defendant next maintains the evidence was insufficient to support the award of $20,000 on the conversion count. In a conversion suit, plaintiff bears the burden of proving damages to a reasonable degree of certainty. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 419 N.E.2d 578.) The evidence must afford a reasonable basis for ascertaining value. "At a minimum, it must rise to the dignity of proof, and supply such elements or standards for measuring value to enable the trier of fact to exercise its judgment." *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 1026, 327 N.E.2d 346, 355.

The trial court properly instructed the jury to assess the damages at the fair market value of Phyllis Filter in foal at the time of the conversion. Plaintiff presented little evidence of this value. He testified he bought the mare for $1,500, and another of his witnesses testified Phyllis Filter was worth $2,000 to $3,500 when plaintiff bought her. Defense witnesses placed Phyllis Filter's value in 1977 between $300 and $2,000. Only one witness testified as to the mare's value in foal, and

that value was $1,000 to $1,500.

On the other hand, plaintiff presented much evidence as to the value of Winter Mite as a three-year-old. Plaintiff's evidence placed the value between $15,000 and $30,000. We conclude this evidence was both irrelevant and prejudicial. Winter Mite's value four years after the conversion did not supply a standard for measuring Phyllis Filter's value at the time of conversion. At the time of conversion, it was assumed Phyllis Filter had been bred to Mr. Magoo. The foal would have been a trotter, not a pacer like Winter Mite. Additionally, one of plaintiff's witnesses testified the sire of Phyllis Filter also sired a racehorse named Goose Filter who won over $300,000. This evidence was also not probative of Phyllis Filter's value at the time of conversion.

The highest amount that anyone placed on Phyllis Filter's 1977 value was $3,500. Thus, we conclude the evidence was insufficient to support the jury's award of $20,000 under the conversion count.

Defendant further argues the trial court improperly instructed the jury on damages under the negligence count. The court instructed the jury to include:

"1. The reasonable expense incurred by plaintiff in caring for the horse Surprise Package;

2. The reasonable expense incurred by plaintiff in caring for the colts of the horse Surprise Package;

3. The fair market value of the horse Phyllis Filter, in foal, at the time of the occurrence; and

4. The monetary loss sustained by reason of plaintiff not having possession of the colt Winter Mite."

Although Phyllis Filter's value at the time of the occurrence was properly included, as previously discussed, plaintiff's evidence did not provide a sufficient basis for the jury to assess this value.

The instruction improperly allowed recovery for Winter Mite's value. Generally, damages for unborn animals are not recoverable. While the mother's value may be enhanced because she is pregnant, the young have no separate market value of their own. (*Nationwide Horse Carriers, Inc. v. Johnston* (Tex. Civ. App. 1974), 519 S.W.2d 163; *Ruden v. Hansen* (Iowa 1973), 206 N.W.2d 713.) It would be too speculative or uncertain to allow recovery for unborn animals. (*Texas Pipe Line Co. v. Sheffield* (Tex. Civ. App. 1936), 99 S.W.2d 684.) Furthermore, allowing recovery for the value of the unborn animal and its mother at the time of the injury would permit a double recovery. *Melton v. South Shore U-Drive, Inc.* (1969), 32 App. Div. 2d 950, 303 N.Y.S.2d 751; *Texas Pipeline Co. v. Sheffield* (Tex. Civ. App. 1936), 99 S.W.2d 684.

The instruction clearly permitted a double recovery. The value of Phyllis Filter in foal would include an amount to reflect the possible future value of her colt. Any monetary losses sustained because plaintiff did not have Winter Mite were not separately recoverable.

Defendant's negligence caused plaintiff to care for horses he did not own or want. Plaintiff, however, cannot recover his expenses for the entire six-year period prior to trial. Defendant gave plaintiff the wrong mare on June 18, 1977, and plaintiff cared for that horse and her colts believing they were his until August 1979. At that time, plaintiff learned of the switch. He could not then stand by and allow the injury to continue to increase without making reasonable efforts to avoid further loss. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 929, 419 N.E.2d 578, 591.) While plaintiff was in contact with Koeber after August 1979, he made no effort to resolve the problem. Nor did he attempt to return the horses to defendant.

In his cross-appeal, plaintiff contends his negligence count and his conversion count sought compensation for separate injuries. He asserts the first injury occurred when defendant negligently bred plaintiff's mare to the wrong stallion and then returned the wrong mare. The second injury was a conversion which occurred at the sheriff's sale. Plaintiff concludes the trial court erred in limiting him to satisfaction on only one of his counts.

At trial, plaintiff proceeded under the theory that the negligence and the conversion occurred at the same time. A party may not abandon in the appellate court a position he took in the trial court. (*Kenny v. Thompson* (1949), 338 Ill. App. 403, 87 N.E.2d 229.) More importantly, the instructions on both counts included the fair market value of Phyllis Filter in foal. Plaintiff cannot recover compensation for this value more than once, regardless of the time he claims he suffered the loss.

Finally, plaintiff asserts the jury intended to assess his total damages at $40,000 instead of $20,000. Because of our disposition of the case, we need not address this issue.

For the foregoing reasons, that portion of the judgment finding defendant liable is affirmed. The damage awards, however, are reversed and the cause is remanded for a new trial on the issue of damages not inconsistent with the views expressed in this opinion.

Affirmed in part, reversed in part, and remanded.

MILLER and WEBBER, JJ., concur.