MARY THOMPSON, Plaintiff-Appellant, v. ABBOTT LABORATORIES, Defendant-Appellee.

Second District No. 2—89—0108

Opinion filed January 16, 1990.

REINHARD, J., specially concurring.

Harold A. Katz and Irving M. Friedman, both of Katz, Friedman, Schur & Eagle, of Chicago (David E. Rapoport, of counsel), for appellant.

Michael J. Cummins, of Waukegan, and Jeri A. Lindahl, of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago (James A. Burstein, of counsel), for appellee.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Mary Thompson, brought a complaint against defendant, Abbott Laboratories, in the circuit court of Lake County, claiming that she had been discharged for filing and pursuing a claim for worker's compensation benefits. Defendant maintained that plaintiff's discharge was due to excessive absenteeism. The jury returned a verdict in defendant's favor. The trial court entered judgment on the verdict and, subsequently, denied plaintiff's post-trial motion.

On appeal, plaintiff raises six issues: (1) that the trial court erred in refusing to tender plaintiff's "mixed motives" instructions to the jury; (2) that the trial court erred in refusing plaintiff's instruction on the failure of a party to call a witness; (3) that the trial court erred in allowing the jury to hear evidence of the charges filed by plaintiff with the Equal Employment Opportunity Commission; (4) that the trial court erred in refusing to allow the jury to see the attendance records of two of plaintiff's co-workers for the years following plaintiff's termination; (5) that the allowable compensatory damages in the instant case should have included pain and suffering, emotional distress, and loss of reputation; and (6) that the trial court erred in denying plaintiff a new trial.

The testimony at trial revealed that plaintiff, Mary Thompson, was hired by defendant, Abbott Laboratories, on March 25, 1969. She was continuously employed by defendant from that date until her termination on December 3, 1984. In December 1979, plaintiff was injured at work lifting I-V solution containers, hurting her right arm and shoulder. In September 1981, plaintiff filed a claim for worker's compensation benefits with the Illinois Industrial Commission after defendant denied plaintiff payment of certain medical bills and lost time. Plaintiff's claim was submitted to an arbitrator of the Industrial Commission in October 1982, resulting in an award of $9,100.

Chuck Santora, senior claims analyst in defendant's risk management department, supervised worker's compensation claims. In the fall of 1981, Santora was assigned plaintiff's worker's compensation case. According to Santora, defendant felt the arbitrator's decision was fair

but that more of an offset should have been awarded to defendant because of compensation already paid by defendant to plaintiff. Therefore, defendant appealed the arbitrator's decision. In June 1983, a decision was made to offer plaintiff a settlement for $8,500, or $600 less than the arbitrator's award. Santora did not know whether the offer was ever conveyed to plaintiff.

On the date of plaintiff's discharge, December 3, 1984, defendant's appeal of the arbitrator's award was still pending. Santora stated that on January 25, 1985, he dismissed the appeal in an attempt to minimize defendant's costs. Although Santora learned after plaintiff's discharge that she had been fired, he was uncertain whether he knew this fact at the time of the dismissal of defendant's appeal. Santora denied any relationship between plaintiff's termination and the subsequent dismissal of defendant's appeal.

In July 1983, plaintiff was working in defendant's quality assurance department, department 817, as a quality control technician, having originally been assigned to quality assurance in 1973. Tim Tomkovich became the supervisor of department 817 in July 1983. In adhering to the attendance policy of the department, Tomkovich reviewed the attendance records of all employees under his supervision. Tomkovich testified that if an employee had a past record of continued absenteeism and this absenteeism continued after he became supervisor, he decided to talk with that employee.

In 1982, plaintiff had had 15 absences, constituting 11 incidences. In 1983, she had been absent 23 days from five incidences. From December 12, 1983, through January 20, 1984, plaintiff had had eight absences resulting from four incidences. On February 6, 1984, Tomkovich counselled plaintiff regarding her excessive absenteeism and placed her on a four-month review period, or probation. Tomkovich testified that he did not know of plaintiff's worker's compensation claim at the time she was placed on probation and that he did not learn of the claim until after plaintiff was terminated.

On April 6, 1984, during her review period, plaintiff was absent again. Tomkovich stated that he discussed this absence with plaintiff and gave her a final warning that any further absence would result in termination. Tomkovich also informed plaintiff that her review period might be extended. During this discussion with plaintiff, plaintiff advised Tomkovich that her arm hurt from working on the "SGL packing line," a glass bottle line, and that she was unable to perform the requirements of the job. Later, Tomkovich informed plaintiff that she would be taken off the SGL packing line and placed at the stopper inspection station so she would not have to handle the weight of the

bottles on the line, thereby relieving some of the strain on her arm.

From June 8 through July 13, 1984, plaintiff was absent. As of July 19, 1984, when Tomkovich again met with plaintiff, plaintiff had accumulated 29 absences for the year. Tomkovich informed plaintiff that her probation was being extended through November 16, 1984, and that any further absences could result in termination.

During this probation period plaintiff was absent from November 8 through November 16, 1984. Tomkovich met with his manager, Dave Chapman, informing Chapman that Tomkovich's counselling sessions with plaintiff had not resulted in any improvement in her attendance. Tomkovich testified that based upon the lack of improvement in plaintiff's attendance record, he and Chapman decided to recommend plaintiff's termination. Tomkovich and Chapman then met with Arnold Radtke, an employee relations representative, to recommend plaintiff's termination.

Arnold Radtke related that on November 20, 1984, Tomkovich and Chapman came to see him. Tomkovich and Chapman wanted to discharge plaintiff, and their documentation in support of the discharge included plaintiff's attendance records for 1983 and 1984. Prior to this meeting, plaintiff had met with Radtke on September 7, 1984, requesting copies of her attendance records. Plaintiff told Radtke that she was being treated unfairly, that she was currently on probation, and that her August pay adjustment had been withheld. Plaintiff maintained that her absences were due to a 1979 work-related injury. In this meeting, plaintiff did not relate to Radtke, either verbally or in writing, that Tomkovich had threatened to fire her because she had filed a worker's compensation claim. Plaintiff told Radtke that her mistreatment by management began when she exercised her policy 222 rights in 1976. Policy 222 was an open-door policy whereby an employee could go to anyone in management to resolve a problem regardless of the type of problem. In 1976, plaintiff had contacted the defendant's chairman of the board regarding a dispute she had with management over a pay increase. As a result, plaintiff obtained the increase.

On October 23, 1984, plaintiff contacted Radtke again, requesting more attendance records.

Radtke described the procedure for firing an employee, explaining that documentation to support an employee's termination would be brought to an employee relations representative who would review it and prepare a work sheet. The documentation and the requests for termination would then be reviewed by higher level managers. Radtke stated that an employee relations representative's role in a discharge

was to check the technical aspects of the discharge and to ensure fairness. In plaintiff's situation, Radtke reviewed records of absenteeism by others in plaintiff's department before reaching any decision regarding plaintiff's termination. Radtke wanted to make certain that others with worse attendance records than plaintiff had also received warnings or had action taken against them and that there was no disparate treatment based on age, sex, or racial factors.

During trial it was brought up that two of plaintiff's co-workers also had had excessive absences during 1983. Cremolia Diggs was absent 53 days in 1983. Betty Burns missed a total of 73 days in 1983 and 1984, although 38 days in 1983 and 19 days in 1984 were due to a broken leg. Both women were placed on probation by Tomkovich in 1984. For the remainder of 1984, Burns missed six days of work. Diggs missed four days in 1984 following her probation period. Neither woman was absent during her review period.

Radtke also testified that he reviewed plaintiff's case with Pete Kinyon, manager of employee relations, Bill Kruger, director of defendant's Lake County personnel, Marv Johnson, manager of corporate employee relations, and Tom Trimble, one of defendant's corporate attorneys. All agreed that plaintiff should be terminated. Plaintiff's termination was effective on December 3, 1984. On that date, plaintiff asked to see those individuals in upper management who were involved in the decision to terminate her. As some were not present at that time, an appointment was set up for plaintiff. Radtke stated that plaintiff never returned for that appointment.

Plaintiff, Mary Thompson, testified that the attendance records kept by defendant were accurate. Plaintiff stated that she was under medical care for two years following her 1979 work-related injury to her right arm and shoulder. It was plaintiff's testimony that she was still under medical treatment for her right shoulder in 1983. Plaintiff related that she was not supposed to work in extremely cold areas because it aggravated her medical problems. According to plaintiff, shortly after Tomkovich's assignment to her department in July 1983, Tomkovich had placed her in charge of the stopper inspection machine, which was in a very cold room. Plaintiff recounted that she had made efforts to get transferred out of this job by talking to Tomkovich, Eugene Patterson, plaintiff's group leader in her department, Marv Johnson, and Irena Patrick Kavaliunas in employee relations. Kavaliunas, senior employee relations representative, told plaintiff that she was not authorized to transfer plaintiff and that plaintiff would need the permission of her department manager (Tomkovich).

Plaintiff stated that in February 1984 she went to see Kavaliunas

regarding a pay raise and a security job offer that had been placed "on the board." According to plaintiff, Kavaliunas told plaintiff that, due to plaintiff's absenteeism, no other department would accept plaintiff. Plaintiff testified that during her conversation with Kavaliunas, Kavaliunas asked plaintiff if she had accepted the defendant's settlement offer on her worker's compensation claim. It was plaintiff's testimony that when plaintiff responded that she had not, Kavaliunas advised plaintiff to accept the offer because "no one refuses the company" when it offers a settlement. Otherwise, plaintiff was going to find herself "out on 14th Street." Fourteenth Street runs outside the gate of defendant's plant.

Later, during her testimony, Kavaliunas positively denied ever making such a threat to plaintiff. Also, Kavaliunas did not recall plaintiff ever complaining about anyone else threatening her. Further, in plaintiff's discovery responses, plaintiff never mentioned that Kavaliunas threatened her, although she did mention the alleged threats of Tomkovich in February and July 1984.

Plaintiff testified that she was first placed on probation in February 1984. Tomkovich called her into the quality assurance department's office and started talking about plaintiff's absences. According to plaintiff, Tomkovich then inquired about whether plaintiff had been to the Industrial Commission, stating that no one files a claim against defendant and that if plaintiff had, she would be "out on 14th Street." During cross-examination, plaintiff stated that she did not remember Tomkovich threatening her regarding defendant's settlement offer at their February 1984 meeting. Rather, she recalled that he talked about "more absentees and things." Tomkovich placed plaintiff on probation at that February meeting.

There were no witnesses to plaintiff's conversations with Tomkovich or with Kavaliunas.

Plaintiff testified that she filed a complaint on October 27, 1984, with the Equal Employment Opportunity Commission (EEOC) after she failed to receive a pay raise in August 1984. Tomkovich had told plaintiff she had not received a raise because of her absenteeism. In her complaint with the EEOC, plaintiff alleged that she was discriminated against because of her race. No mention was made in that charge of threats by Kavaliunas or Tomkovich. The EEOC found no racial discrimination.

After plaintiff's termination, she filed another charge with the EEOC on December 27, 1984, alleging that although poor attendance had been given by defendant as the reason for her discharge, she believed she had been discharged in retaliation for having filed her pre-

vious EEOC charge. In her second charge, plaintiff admitted that her attendance had been poor but stated that all her absences were documented by medical excuses. This charge and the former charge were dismissed by the EEOC.

During defendant's case, Eugene Patterson, group leader for plaintiff in the quality assurance department, was asked if plaintiff had ever told him, after February 1984, that Kavaliunas or Tomkovich had threatened her job because she was pursuing a worker's compensation claim. Patterson answered in the negative.

Bill Kruger, director of defendant's Lake County personnel, was asked about defendant's policy towards employees who file worker's compensation claims. Kruger replied that the defendant's policy was to assist employees in filing their claims and to accept this duty as defendant's obligation and an employee's right.

Chuck Santora, senior claims analyst in defendant's risk management department, testified that he handled anywhere from 65 to 80 worker's compensation claims per year. Santora stated that he had been handling plaintiff's case since September 1981 and that plaintiff had been represented by an attorney in her claim. According to Santora, no one had ever told him that plaintiff had been threatened for filing or pursuing her worker's compensation claim.

At the conclusion of all the evidence, the court held the jury instruction conference. During the conference, the court refused plaintiff's instructions on "mixed motives" and plaintiff's instruction on the inferences that can be drawn from the failure of a party to call a witness under its control. The court also refused to admit the attendance records of plaintiff's co-workers, Cremolia Diggs and Betty Burns, for the years following plaintiff's discharge. Additionally, the court refused to include emotional distress, pain and suffering, and loss of reputation as elements of plaintiff's possible compensatory damages. Over plaintiff's objection, plaintiff's prior EEOC charges were admitted for impeachment purposes.

Plaintiff's case was submitted to the jury, which returned a verdict in defendant's favor. Plaintiff filed a post-trial motion, requesting a new trial or judgment notwithstanding the verdict. The motion was denied, and plaintiff appeals.

Plaintiff first contends that the trial court committed reversible error in refusing to tender plaintiff's "mixed motives" instructions to the jury. Plaintiff's mixed-motives instructions instructed the jury that there could be more than one factor or cause for plaintiff's discharge and that, if one of the factors was pursuit of her worker's compensation claim, plaintiff was entitled to recover.

Although a few jurisdictions have adopted the mixed-motive theory in determining the outcome of worker's compensation cases, Illinois has thus far not addressed the issue. Moreover, we need not address it here, as the evidence clearly showed that plaintiff's filing of her worker's compensation claim was not a factor or motive in her termination.

Plaintiff filed her worker's compensation claim in September 1981. Plaintiff was fired by defendant in December 1984; the reason given was excessive absenteeism. The evidence showed that when plaintiff's supervisor, Tim Tomkovich, took over plaintiff's department in July 1983, he reviewed the attendance records of the employees in his department, determining that he would counsel those who had excessive absenteeism. In 1982 plaintiff had had 15 absences, and in 1983 she had had 23 absences. Prior to Tomkovich's meeting with plaintiff in February 1984, plaintiff was absent eight times between December 12, 1983, and January 20, 1984.

In a written report of his February 4, 1984, meeting with plaintiff, Tomkovich stated that he discussed plaintiff's attendance problems with her, telling her that he was placing her on a four-month probation and that more attendance problems would warrant further disciplinary action. During this probationary period, plaintiff was absent again on April 6, 1984. Tomkovich met with plaintiff and discussed her absence, informing plaintiff that if she was absent during the remainder of her review period, she would be terminated. Tomkovich also informed her that her review period might be extended.

From June 8 through July 13, 1984, plaintiff was absent. Tomkovich met again with plaintiff on July 19, 1984. As of that date, plaintiff had accumulated 29 absences for the year. Tomkovich informed plaintiff that her probation was being extended through November 16, 1984, and that any further absences could result in termination. During this probationary period, plaintiff was again absent from November 8 through November 16. Tomkovich then began taking steps to arrange for plaintiff's termination.

During trial plaintiff attempted to show that two other employees, Cremolia Diggs and Betty Burns, also under Tomkovich's supervision, had had worse attendance records than plaintiff, yet were not fired. The testimony showed that Diggs was absent 53 days in 1983 and that Burns was absent a total of 73 days in 1983 and 1984. Thirty-eight days of Burns' absence in 1983 and 19 days in 1984 were due to her having broken a leg. Both Diggs and Burns were placed on probation by Tomkovich in 1984. Following her period of probation, Diggs was absent only four days for the remainder of 1984. Burns missed only six days. Thus, the attendance records of both Diggs and Burns improved

substantially as a result of being placed on probation.

Despite Tomkovich's warnings to plaintiff and the extension of her probationary period, it was unlikely that her absenteeism would substantially improve. The major portion of Burns' absences in 1983 and 1984 resulted from a broken leg, a mishap that was unlikely to happen frequently. Conversely, plaintiff's absences had been due to unremitting problems with her right arm and shoulder, which had been injured in her 1979 work-related accident. These problems had made it difficult for plaintiff to work on the "SGL packing line" because lifting of I-V bottles was involved. In an attempt to solve this problem, Tomkovich placed plaintiff at the stopper inspection station. However, this station was in a room which plaintiff complained was cold, and cold temperatures also adversely affected her shoulder and arm.

Plaintiff's condition was chronic and not likely to improve. Several of her absences involved hospitalizations for tingling and numbness to her right arm and shoulder and for pain radiating down her right side and to her right leg. Plaintiff's testimony showed that even a year after leaving defendant, she still suffered from these same maladies, finding it difficult to even screw off the top of a catsup bottle with her right hand. In 1987, plaintiff continued to suffer from pain to the right shoulder and arm, finding it painful to write.

Although plaintiff maintained at trial that her termination was due to her filing of her 1981 worker's compensation claim rather than to her excessive absences, Tomkovich testified that he had no knowledge of plaintiff's claim until after her termination. It was plaintiff's testimony that both Tomkovich and Irena Patrick Kavaliunas, an employee relations representative whom plaintiff had contacted regarding pay raises and another position within defendant's company, had told her that if she did not accept defendant's settlement offer of her worker's compensation claim, she would be "out on 14th Street," *i.e.*, out of a job. However, in plaintiff's discovery responses she made no mention of Kavaliunas' alleged threat, although plaintiff did state that Tomkovich had threatened her in February and July 1984. Plaintiff admitted that no witnesses were present at the times the alleged threats were made by Tomkovich and Kavaliunas.

Further, testimony by other individuals within the defendant company made it doubtful that any such threats occurred. Arnold Radtke, an employee relations representative, related that on September 7, 1984, plaintiff had requested copies of her attendance records from him, telling him that she was being treated unfairly because of her absenteeism. Plaintiff never mentioned to Radtke any threats by Tomkovich or Kavaliunas or that she was being treated unfairly be-

cause of her worker's compensation claim. According to Chuck Santora, senior claims analyst in defendant's risk management department and the individual who had been handling plaintiff's worker's compensation claim since 1981, plaintiff had been represented by an attorney in her claim and, yet, no one had ever told him that plaintiff had been threatened for filing or pursuing her worker's compensation claim.

Also, defendant had a policy, "Policy 222," wherein an employee could approach any individual in management, even the chairman of the board, to resolve a problem that the employee had with defendant. Plaintiff was cognizant of this policy, having exercised her policy 222 rights in 1976 by seeking out the chairman of the board when she failed to receive a pay increase. As a result of exercising her policy 222 rights, plaintiff had received the increase. Thus, if plaintiff felt she was being mistreated by individuals in defendant's company because of her refusal to accept the defendant's settlement offer, she could have utilized her policy 222 rights to complain to someone in upper management. However, plaintiff never took this action even though she was aware that it was available to her.

■ The credibility of the witnesses and the weight to be given their testimony are matters for the jury's consideration. (*Pagel v. Yates* (1984), 128 Ill. App. 3d 897, 901.) Here, the evidence supported the jury's apparent determination that plaintiff's testimony was less credible than the other witnesses who testified.

Plaintiff's testimony that defendant discharged her for failing to settle her worker's compensation claim was also controverted by the charge plaintiff filed with the EEOC on October 27, 1984, prior to her discharge, and the charge she filed on December 27, 1984, subsequent to her discharge. Copies of these charges were admitted into evidence. In her October 27 charge, plaintiff maintained that she had failed to receive a pay raise in August 1984 because of her race. Tomkovich had explained to plaintiff that her failure to receive a raise was due to her absenteeism. In her December 27 charge, plaintiff admitted that her poor attendance had been given as a reason for her discharge but alleged that she believed her termination was in retaliation for having filed the former EEOC charge. Neither charge contained any allegation related to the filing of her worker's compensation claim and her failure to accept defendant's settlement offer. Thus, plaintiff's testimony at trial was materially inconsistent with the allegations in her EEOC complaints and was substantially discredited or impeached by the introduction of these charges. See *Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 3d 539, 551.

Further, we find it incredulous that a company would fire an employee for failing to accept a settlement offer that was only $600 less than the arbitrator's award, *i.e.*, $8,500 as opposed to $9,100. If the award had been for a much larger amount, *i.e.*, $500,000, and if defendant was trying to get plaintiff to accept a substantially smaller sum as a settlement, *i.e.*, $100,000, then perhaps an argument could be made that defendant had fired plaintiff in retaliation for her failure to accept defendant's settlement. However, to even hint at such a possibility here where defendant offered a mere reduction of $600 in plaintiff's compensation award is unreasonable. Additionally, the evidence showed that defendant dealt with many compensation cases, 65 to 80 claims per year. Yet, no evidence was presented to show that defendant reacted negatively towards the filing of these claims.

Plaintiff attempts to make much of exhibit 18 which she introduced into evidence. Exhibit 18 consisted of two sheets of handwritten notes. The identity of the author was never shown by plaintiff although plaintiff maintained a member of management wrote it. Nevertheless, the notes pertained mainly to plaintiff's inability to pass her "certification test" and management's speculation as to why. Although the document referred to plaintiff's worker's compensation case, the references pertained only to the facts that an award was made, that defendant "countered," that plaintiff refused, and that the case was to be settled. As defendant points out, this document did not support plaintiff's position that plaintiff's worker's compensation claim was one of the motives for her termination.

■ ■ Giving or denying a jury instruction is discretionary with the trial court, and a new trial will be granted for refusal to give a tendered instruction only where serious prejudice to a party's right to a fair trial has been shown. (*Yedor v. Centre Properties, Inc.* (1988), 173 Ill. App. 3d 132, 146.) The standard for determining the adequacy for jury instructions is whether, taken as a whole and in series, the instructions fairly, fully, and comprehensively apprised the jury of the applicable legal principles. (*Lurz v. Panek* (1988), 172 Ill. App. 3d 915, 925.) Jury instructions should not overemphasize any particular matter and should be sufficiently clear so as not to confuse or mislead the jury. *Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 872.

■ Plaintiff's complaint against defendant was for retaliatory discharge, alleging that she had been discharged for pursuing her rights under the terms of the Workers' Compensation Act. (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*) Here, the jury was properly instructed in the elements plaintiff was required to prove to prevail in her claim of retaliatory discharge. Plaintiff's "mixed motives" or "mixed fac-

tors" instructions were non-IPI instructions, were not impartial, and overemphasized that plaintiff need only show that more than one factor was involved in defendant's decision to terminate plaintiff. Plaintiff's mixed-motives instructions attempted to change the appropriate legal standard in Illinois for retaliatory discharge cases. As the evidence clearly showed that plaintiff's worker's compensation claim was in no way related to her discharge, it would have been both inappropriate under Illinois law and misleading to give plaintiff's instructions.

Further, we note that the trial court did tender defendant's instruction No. 13 to the jury, which also was a non-IPI instruction and which instructed the jury to find that "the true reason and motive" for plaintiff's discharge was her pursuit of the right to obtain worker's compensation benefits, thereby implying, as plaintiff desired, that more than one reason could have resulted in plaintiff's discharge.

We conclude that plaintiff was not denied a fair trial by the trial court's refusal of her mixed-motives instructions.

In her second contention, plaintiff argues that the trial court erred in refusing to instruct the jury on the inferences the jury could draw from the defendant's failure to call certain witnesses. Plaintiff maintains that defendant deliberately failed to call anyone to testify regarding upper management's review, discussions, and authorization of plaintiff's termination and that because these individuals were under the control of the defendant and not equally available to plaintiff, the jury could have inferred from their failure to testify that their testimony would have been unfavorable to defendant. Thus, plaintiff asserts, the trial court should have tendered to the jury plaintiff's instruction No. 7, which directly dealt with this failure.

Plaintiff's instruction No. 7, which is Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d No. 5.01), stated:

> "If a party to this case has failed to offer evidence within his power to produce, you may infer that the evidence would be adverse to that party if you believe each of the following elements:
>
> 1. The evidence was under the control of the party and could have been produced by the exercise of reasonable diligence.
>
> 2. The evidence was not equally available to an adverse party.
>
> 3. A reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.
>
> 4. No reasonable excuse for the failure has been shown."

■◀■ The giving of IPI Civil 2d No. 5.01 is within the sound discretion of the trial court, and a court of review should reverse only

when a clear abuse of discretion appears of record. (*Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 776.) Before giving the instruction, the trial court must first determine whether, in all likelihood, the party would have produced the witness under the facts and circumstances of the case unless the testimony would be unfavorable. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1047.) The instruction is not warranted when the testimony of the unproduced witness would be merely cumulative of the facts already established. *Chuhak v. Chicago Transit Authority* (1987), 152 Ill. App. 3d 480, 489.

Plaintiff points out that although the initial recommendation to terminate plaintiff came from Tim Tomkovich and Dave Chapman, others were involved: Arnold Radtke, employee relations representative; Pete Kinyon, manager of employee relations; Bill Kruger, director of defendant's Lake County personnel; Marv Johnson, manager of corporate employee relations; and Tom Trimble, one of defendant's corporate attorneys. Both Tomkovich and Radtke, as adverse witnesses, testified regarding the decision to terminate plaintiff. Tomkovich related his reasons leading up to his recommendation for plaintiff's termination, his discussion of these reasons with his manager, Dave Chapman, and their mutual decision to meet with Arnold Radtke to recommend plaintiff's termination.

Radtke testified that he met with Tomkovich and Chapman and that he (Radtke) then reviewed the documentation presented to him in support of Tomkovich's and Chapman's recommendation to fire plaintiff. Radtke described the procedure involved in firing an employee and explained how he reviewed plaintiff's attendance records as well as those of others in plaintiff's department before reaching any decision regarding plaintiff's termination. Radtke stated that he then met with Kinyon, Kruger, Johnson, and Trimble regarding plaintiff's termination and that all agreed that plaintiff should be terminated. That he had these meetings and termination was the outcome reached therein was noted in a memo Radtke placed in plaintiff's file.

Bill Kruger, director of defendant's Lake County personnel, testifying on defendant's behalf, explained defendant's policy towards employees who file worker's compensation claims. Although Kruger was available for plaintiff to examine, plaintiff elected not to cross-examine him.

We agree with defendant that the testimony of Chapman, Kinyon, Johnson, and Trimble would have been cumulative. We also agree with the trial court's statement, in refusing plaintiff's instruction No. 7, that defendant's decision not to call these witnesses was a matter of

trial strategy. Despite plaintiff's claim that these individuals were not available to her because they were defendant's employees, the names, home addresses and telephones of all these individuals, as well as those of Tomkovich, Radtke and Kruger, were provided to plaintiff by defendant 20 months prior to trial. Since plaintiff called Tomkovich and Radtke as adverse witnesses under Supreme Court Rule 237 (107 Ill. 2d R. 237), she could have called the other employees involved in plaintiff's termination as well. (See *Myre v. Kroger Co.* (1988), 176 Ill. App. 3d 160, 167.) They were equally available and accessible to plaintiff.

Plaintiff, however, relies on a recent Illinois Supreme Court case, *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, to argue that an employee of a defendant, whose identity was disclosed to the plaintiff before trial, is not equally available to plaintiff just because he could be compelled to attend trial under Supreme Court Rule 237.

We note first that *Schaffner* made no determination whether an employee becomes equally available when called under Supreme Court Rule 237. Moreover, *Schaffner* is distinguishable from the instant case.

Shortly after plaintiff's accident in *Schaffner*, North Western sent its employee, McClellan, to inspect the railroad crossing involved in the accident. McClellan was accompanied by a photographer, who took North Western's photographs of the accident scene. At trial plaintiff presented evidence that the crossing was rough and uneven and that there were substantial deviations between the tops of the rails and the crossing surface where plaintiff's bicycle wheel had become disengaged. North Western presented evidence that the rails and crossing surface were substantially flush and that the crossing was not rough.

In argument, codefendant, Schwinn Bicycle Company, commented adversely on McClellan's absence at trial. However, Schwinn did not tender the missing-witness instruction (IPI Civil 2d No. 5.01), nor was an instruction on that subject given. The supreme court concluded that the trial judge did not abuse his discretion in allowing Schwinn to comment adversely on North Western's failure to call its employee McClellan. The supreme court determined that McClellan, as North Western's employee, was within the railroad's control and that it could be assumed that North Western would have presented McClellan if it had believed that his testimony would be favorable. 129 Ill. 2d at 23-24.

Under the circumstances presented in *Schaffner*, we believe the supreme court was correct in its conclusion. Plaintiff and North Western had presented conflicting evidence regarding the condition of the railroad crossing. McClellan personally observed the crossing shortly after

the accident, and the photographer accompanying him had taken photographs of the condition of the crossing. North Western's photographs were subsequently barred from evidence at trial. After their exclusion, the trial judge stated that he would permit Schwinn's counsel, in cross-examining McClellan, to refer to the taking of the excluded photographs, which were taken from an east-west perspective, perpendicular to the tracks. The photographs introduced into evidence by the plaintiff and Schwinn were taken in a north-south direction to show the gaps running between the rails and surrounding timbers. Given the conflicting testimony presented by the parties regarding the condition of the railroad crossing and McClellan's personal inspection of the crossing shortly after the accident, the supreme court was justified in finding that North Western's failure to call McClellan as a witness was due to its belief that McClellan's testimony would have been unfavorable.

In the instant case, defendant's failure to produce all the witnesses involved in plaintiff's termination could not lead to a similar conclusion. A thorough explanation of the process and individuals involved in plaintiff's termination was brought out by plaintiff through examination of defendant's employees, Tomkovich and Radtke, as adverse witnesses. It was likely that the testimony of the other individuals involved in the termination decision would have been merely cumulative of Tomkovich's and Radtke's testimony. Moreover, had plaintiff believed these individuals had evidence unfavorable to defendant's case, plaintiff's counsel could have deposed them to discover if that belief was justified. The record shows, however, that although plaintiff had notice of all these witnesses, plaintiff deposed only one of them, Arnold Radtke.

■ We conclude that the giving of IPI Civil 2d No. 5.01 would have had the effect of implying to the jury that the defendant was hiding evidence from the plaintiff and that, therefore, the trial court did not abuse its discretion in refusing it. Nevertheless, even if IPI Civil 2d No. 5.01 should have been given, the failure to give the instruction would not alone constitute reversible error in this case. See *Hicks v. Hendricks* (1975), 33 Ill. App. 3d 486, 492-93.

Plaintiff's third contention is that the trial court erred in allowing the jury to hear evidence of the charges filed by plaintiff with the Equal Employment Opportunity Commission (EEOC). Defendant maintains that the admission of the EEOC complaints was proper for impeachment purposes.

Plaintiff failed to receive a pay raise in August 1984. Tomkovich told plaintiff that this was due to her excessive absenteeism. On Octo-

ber 27, 1984, plaintiff filed a complaint with the EEOC stating that it was not defendant's policy to withhold an employee's wage increase just because that employee was on probation. Plaintiff claimed that she had been discriminated against because of her race since another employee, a Caucasian, who also had an attendance problem and had been placed on probation for a week in July, had received her wage increase. The EEOC found no racial discrimination.

Following her termination, plaintiff filed another charge with the EEOC on December 27, 1984, alleging that she had been discharged in retaliation for having filed her previous EEOC charge. In her charge of December 27, plaintiff admitted that her attendance had been poor but stated that her absences were documented by medical excuses. Despite these charges with the EEOC, which made no mention of plaintiff's 1981 worker's compensation claim, it was plaintiff's position at trial that her discharge had been in retaliation for her filing of her 1981 worker's compensation claim against defendant and her refusal to accept defendant's settlement offer.

■ To be used for impeachment, a prior statement of a witness must be materially inconsistent with her trial testimony. (*Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 3d 539, 551.) The test to be applied is whether the statement has a reasonable tendency to discredit the witness' direct testimony on a material matter. (180 Ill. App. 3d at 551.) Whether to allow the admission of evidence for impeachment purposes is within the trial court's discretion, and a court of review will not disturb the decision of the trial court absent an abuse of discretion. 180 Ill. App. 3d at 551.

■ Here, both of plaintiff's EEOC complaints, which were materially inconsistent with plaintiff's trial testimony, were signed by plaintiff, thereby verifying that plaintiff authorized or confirmed the truth of the allegations contained therein. (*Cf. Ryan v. Mobile Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1080-81.) We, therefore, conclude that the trial court's admission of these prior inconsistent statements for impeachment purposes was a proper exercise of the court's discretion.

Next, plaintiff contends that the trial court erred in refusing to allow the jury to see the attendance records of plaintiff's co-workers, Cremolia Diggs and Betty Burns, for the years following plaintiff's termination. Plaintiff maintains that although Diggs and Burns continued to have worse attendance records than plaintiff, even in years following the discharge, defendant did not take any action against them and that, therefore, the jury should have been allowed to review or consider Diggs' and Burns' records for 1985, 1986, 1987 and 1988.

We agree, however, with defendant that the attendance records of

Diggs and Burns during the years 1985 through 1988 were irrelevant to the issues in the instant case. At trial, plaintiff's attendance was compared with that of Diggs and Burns for 1983 and 1984, the years directly preceding her termination. All three women had been warned and put on probation by Tomkovich in 1984 for their absenteeism. In 1983, plaintiff was absent 23 days; in 1984 she missed 36 days, 32 of which occurred while plaintiff was on attendance review, or probation. In contrast, although Cremolia Diggs was absent 51 days during 1983, she missed only eight days during 1984. Although Betty Burns was absent 48 days in 1983 and 25 days in 1984, 38 of the 1983 absences and 19 of the 1984 absences occurred after Burns broke her leg. Moreover, the testimony showed that both Diggs' and Burns' attendance had substantially improved after having been placed on probation.

■■ Moreover, as defendant points out, although Tomkovich had the discretion to implement his own standards for obtaining good attendance, no evidence was presented that either Diggs or Burns remained under Tomkovich's supervision after plaintiff's discharge. Furthermore, no evidence was presented regarding what the attendance policy was towards these employees for the years following plaintiff's discharge. We conclude that the trial court did not err in keeping Diggs' and Burns' attendance records for 1985, 1986, 1987 and 1988 from the jury, as they were irrelevant to the issue of whether plaintiff had suffered disparate treatment.

■■ In her fifth contention, plaintiff argues that the allowable compensatory damages in the instant case should have included pain and suffering, emotional distress, and loss of reputation. However, it is not necessary to review this issue since we have determined that plaintiff did not prove her liability case.

■■ Finally, plaintiff contends that the trial court failed to correct the prejudicial errors which occurred at trial when it denied her motion for a new trial. A motion for a new trial is addressed to the sound discretion of the trial court, and its decision will not be disturbed unless there is a clear abuse of discretion that affirmatively appears on the record. *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812.

■■ Here, there is nothing which affirmatively appears on the record to suggest that the trial court abused its discretion in denying plaintiff's motion for a new trial. It was plaintiff's burden to prove that her pursuit of worker's compensation benefits was the motivating factor or, as she contends, a motivating factor in her discharge. Yet, as we have concluded earlier in this disposition, the giving of any of plaintiff's mixed-motives instructions would have been inappropriate and

misleading. As a result, the trial court did not abuse its discretion in refusing to give plaintiff's mixed-motives instructions to the jury.

Likewise, as we have also previously discussed in this disposition, the court did not abuse its discretion in refusing to instruct the jury on the failure of a party to call a witness, to admit the EEOC charges into evidence, or to exclude the attendance records of plaintiff's co-workers for the years following plaintiff's discharge. None of these decisions by the trial court amounted to error.

 █ In determining the propriety of a new trial, a reviewing court must consider not only the jury's verdict but also the fact that the trial judge, who saw and heard the witnesses and arguments of counsel, denied the moving party's post-trial motion. (*Cadral Corp. v. Solomon, Cordwell, Buenz & Associates, Inc.* (1986), 147 Ill. App. 3d 466, 483.) Based on the testimony of the witnesses and the arguments of counsel which appear in the record before us and on our review of plaintiff's contentions of error, the trial court's denial of plaintiff's post-trial motion was proper.

Based on the reasons set forth, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, J., concurs.

JUSTICE REINHARD, specially concurring:
While I agree with the result reached in the majority opinion, I specially concur in order to set forth my own views regarding the issue of whether the trial court erred in refusing plaintiff's tendered "mixed motive" instruction.

Plaintiff contends that the trial court erred in not instructing the jury that if it found that her filing a worker's compensation claim was a substantial or motivating factor in her discharge, then it should find for plaintiff on her retaliatory discharge claim. Defendant responds, *inter alia*, that a mixed-motive instruction, as urged by plaintiff, is inappropriate under existing Illinois law.

The parties do not cite, nor does my research indicate, any Illinois case addressing this precise issue. A plaintiff who claims retaliatory discharge based on her exercise of her rights under the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) must prove that her discharge was causally related to her filing a claim under the Act. (*Motsch v. Pine Roofing Co.* (1988), 178 Ill. App. 3d 169, 173, 533 N.E.2d 1; *Slover v. Brown* (1986), 140 Ill. App. 3d 618, 620-

21, 488 N.E.2d 1103.) The causality element, however, requires more than a discharge in connection with a filing of a worker's compensation claim. (*Motsch*, 178 Ill. App. 3d at 174, 533 N.E.2d at 4-5.) Causality is not established where the basis for the discharge is valid and nonpretextual. *Motsch*, 178 Ill. App. 3d at 174, 533 N.E.2d at 5; *Slover*, 140 Ill. App. 3d at 621, 488 N.E.2d at 1105.

The two pertinent instructions given in this case on the plaintiff's burden of proof are as follows:

"[Defendant's Instruction No. 10] In order to prevail on a claim for retaliatory discharge, Plaintiff must prove each of the following elements by a preponderance of the evidence:

1. That she was discharged in retaliation for the pursuit of her rights to obtain worker's compensation benefits; and

2. That she suffered damage as a consequence of the discharge.

If you find that the Plaintiff has proven each of these elements by a preponderance of the evidence, then your verdict should be for the Plaintiff. If, on the other hand, you find that any of the above elements have not been proved by Plaintiff by a preponderance of the evidence, then your verdict should be for the Defendant.

\* \* \*

[Defendant's Instruction No. 13] When I say that Plaintiff must prove that she was discharged in retaliation for the pursuit of her right to obtain worker's compensation benefits, I mean that Plaintiff must prove that the motive, or actual reason, for her discharge was her pursuit of her rights to obtain worker's compensation. Thus, if you find that the true reason or motive for the Plaintiff's discharge was her pursuit of her right to obtain worker's compensation benefits, then you must find that this element of the claim has been satisfied. On the other hand, if you find that the discharge was not motivated by the Plaintiff's pursuit of her right to obtain worker's compensation benefits, then you must find that this element has not been satisfied, even if the discharge was unfair, unwise, or otherwise improper.

The fact that an at-will employee has filed a claim for worker's compensation does not mean that she may not thereafter be discharged, only that she may not be discharged for pursuit of her right to obtain worker's compensation benefits. It is for you to determine from the evidence whether or not the employer's true reason for discharging the Plaintiff was the pursuit of her right to obtain worker's compensation benefits."

These instructions, requiring the jury to determine the true reason for the discharge, either plaintiff's absenteeism or her filing of a worker's compensation claim, are consistent with Illinois law requiring her to establish causality. Such an approach allows the jury, as the trier of fact, to decide what the true reason was for plaintiff's discharge. (See *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812, 537 N.E.2d 1348.) If the jury accepts defendant's reason as the true reason for the discharge, as it apparently did here, it must necessarily reject plaintiff's alleged reason. An instruction requiring the jury to choose which reason is the true reason for the discharge, as was given in this case, is consistent with plaintiff's burden of proving causality.

Giving a mixed-motive instruction, as urged by plaintiff, would effectively expand the tort by allowing a plaintiff to prove retaliatory discharge even though an employer terminated the plaintiff for a legitimate reason. In Illinois, the tort of retaliatory discharge, an exception to the common-law doctrine that an employer may discharge an employee at will for any reason or no reason, has been narrowly interpreted, and its expansion has not been encouraged. (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525, 478 N.E.2d 1354; *Veit v. Village of Round Lake* (1988), 167 Ill. App. 3d 350, 353, 521 N.E.2d 145.) Such an expansion as would result by instructing on mixed motive would have a devastating impact on the at-will doctrine. Rather, I believe the current law requiring the plaintiff to establish causality strikes the appropriate balance between an employee's right not to be fired in contravention of a clearly mandated public policy and an employer's right to discharge an employee at will for any reason or no reason.

While plaintiff cites numerous cases in support of her contention, I am unpersuaded as those cases either do not address the tort of retaliatory discharge as recognized in Illinois or are from foreign jurisdictions whose policies regarding retaliatory discharge may very well be quite different from ours. Further, it would be inappropriate to apply the standards under the Civil Rights Act of 1964, as utilized in several cases cited by plaintiff, to a retaliatory discharge case brought under Illinois law. (*Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812, 537 N.E.2d 1348.) For these reasons, I agree with the trial court's refusal to give plaintiff's proffered instructions on mixed motive.