JULAINE CHIRICOSTA, as Mother and Next Friend of Nicholas Chiricosta, a Minor, Plaintiff-Appellant, v. WINTHROP-BREON *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—2559

Opinion filed May 27, 1994.

134

Goldberg & Goldberg and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

Torshen, Schoenfield & Spreyer, Ltd., and Garretson & Santora, both of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for appellee Winthrop-Breon.

Wildman, Harrold, Allen & Dixon and Swanson, Martin & Bell, both of Chicago (Ruth E. VanDemark, Mary Elisabeth Ruether, and Kay Schichtel, of counsel), for appellee Moon Kim.

Johnson & Bell, Ltd., of Chicago (William V. Johnson, Thomas H. Fegan, and Kathryn K. Loft, of counsel), for appellees Marjorie Prombo and Flossmoor Common Pediatrics, Ltd.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Jr., Gregory E. Schiller, Timothy J. Ashe, and Barbara E. Pitts, of counsel), for appellee St. James Hospital.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

This is an appeal by the plaintiff, Julaine Chiricosta, who filed a malpractice claim on behalf of her son, from a jury verdict in favor of the defendants. She contends that the jury verdict is against the manifest weight of the evidence and, alternatively, that trial errors occurred that require a new trial.

The plaintiff's son, Nicholas, was born at St. James Hospital. Before her delivery, the plaintiff was given 25 milligrams of a narcotic drug, Demerol, to relieve pain. There were no complications during the delivery and Nicholas' condition was stable for the first five minutes after delivery. After leaving the delivery room, however, Nicholas had trouble breathing in the nursery. Two and a half hours later, Nicholas' condition did not improve and he was transferred to Rush-Presbyterian-St. Luke's Hospital (Rush). This suit focuses on those $2^1/2$ hours after delivery. (The Rush team determined that Nicholas suffered from persistent fetal circulation of unknown etiology during those $2^1/2$ hours after delivery.) Today, Nicholas suffers from cerebral palsy.

The plaintiff alleged that the intravenous administration of Demerol approximately 30 minutes before delivery crossed the placental barrier and caused injury to the fetus. The plaintiff also claimed that the doctors and St. James personnel who cared for Nicholas in the nursery were negligent in their treatment.

The plaintiff named the following as defendants: Dr. Thomas Iannucci, her obstetrician; Suburban Heights Medical Center, of which Dr. Iannucci was a member; Dr. Marjorie Prombo, a pediatrician; Flossmoor Commons Pediatrics, Ltd., Dr. Prombo's medical group; Dr. Moon Kim, a neonatologist[1] who headed the nursery; St. James Hospital; Nurse Mary Pat O'Leary, Nurse Sharon Kosteroski and respiratory therapist Louis Davlantis, employees of St. James; and Winthrop-Breon (Winthrop), the manufacturer of Demerol. The plaintiff alleged negligence theories against the doctors; a *respondeat superior* theory against St. James for the negligence of its nurses and respiratory therapist; and strict liability theory against Winthrop.

A two-month trial involved all occurrence witnesses and 12 experts. While the jury deliberated, Dr. Iannucci and Suburban Heights Medical Group settled with the plaintiff for $1.6 million. The jury found all other defendants not guilty. We will first address the plaintiff's claim that the verdict was against the manifest weight of the evidence.

The plaintiff was admitted to St. James Hospital by Dr. Dale Col-

---

[1]A neonatologist specializes in the medical treatment of newborn babies.

lins, a partner in the Suburban Heights Medical Center, at 5:40 a.m. on March 22, 1982, for the delivery of her third child.

At 7:40 a.m., Dr. Iannucci performed a vaginal examination. He also ordered "Demerol, 25 milligrams I.V. p.r.n. for pain." (P.r.n. is an abbreviation for *pro re nata* meaning "as needed or as the occasion arises.") He did not order a specific time when the Demerol was to be given. He left the decision to the nurse whenever, in her medical judgment, she thought it appropriate to give it. The Demerol order was for a single dose. Based on her experience, Nurse O'Leary knew that she was to give one dose and contact Dr. Iannucci if the patient requested more pain reliever.

At about 9:30 a.m., the plaintiff's labor pains increased, and she requested something to take the edge off her pain. O'Leary administered a single dose of 25 milligrams of Demerol intravenously by slowly giving an injection in a premeasured syringe directly into the vein. It took between 50 seconds and a minute to give the injection.

Before the plaintiff was transferred to the delivery room, the fetal heart rate was checked eight times and was within normal range of 120 to 160 beats per minute. At 9:30 a.m., before the Demerol was administered, the fetal heart tones had risen to 134 to 135. At 9:45 a.m., the heart rate returned to 120. After the Demerol was administered, the plaintiff did not observe any respiratory depression.

By 9:45 a.m., the cervix was fully dilated and the plaintiff was transferred from the labor room to the delivery room, accompanied by O'Leary. At 10:07 a.m., Dr. Iannucci delivered Nicholas head first. There were no complications in the delivery room, no observed abnormalities and no gross congenital abnormalities. According to Dr. Iannucci, Nicholas was breathing on his own. There were no clinical signs of respiratory depression in the delivery room, and no apparent reason to administer oxygen or use any other resuscitative measures. Nothing in the delivery room indicated that Nicholas suffered from narcotization upon delivery. Dr. Iannucci testified that he had seen babies who suffered from such a condition upon delivery and the delay they experienced in starting to breathe. He described those babies as limp or floppy without good muscle tone. They also do not cry, and their color may or may not be pink.

The one-minute and five-minute Apgar scores were made at 10:08 a.m. and 10:12 a.m. "Apgars" are named after Dr. Virginia Apgar and are a tool for a quick assessment of a newborn's condition. Five items, heart rate, muscle tone, reflex irritability, respiration and skin color, are scored 0, 1 or 2. The maximum total score is 10, which is relatively unusual, particularly at the one-minute score because it takes over one minute for the entire body, including fingertips and

toes, to become pink. O'Leary's scores for Nicholas were "8" at both the one-minute and five-minute scores, which she considered to be good scores. She gave him a score of "2" in the categories of heart rate, muscle tone, and reflex irritability and a score of "1" for respiration and skin color. For the heart rate score, a "2" would indicate a heart rate of 100 beats per minute at a minimum. For muscle tone, a score of "2" indicates that the baby is moving spontaneously. Reflex irritation refers to whether the baby has a lusty cry and responds to external stimulation, such as startle, sucking or gag reflexes. She also noted that Nicholas' throat had more mucous than she normally saw.

The respiration score was given, according to O'Leary, because Nicholas was making a "grunting" sound or low congested sound after delivery. (A score of "2" would indicate regular breathing at a rate of 35 to 50 breaths per minute and a "0" would indicate no spontaneous respiration.) O'Leary stated that a "1" is given for a slow breathing rate or some abnormal or irregular manner of breathing. O'Leary gave Nicholas a "1" for skin color, which usually refers to a baby whose body is pink but whose extremities (hands or feet) still have a bluish coloration.

Dr. Iannucci gave Nicholas a total Apgar score of "8" at the one-minute interval (with a score of "1" for respiration and skin color) and gave a "9" at the five-minute interval. Dr. Iannucci gave Nicholas a "9" because he scored respiration at "2." He thought that the grunting indicated that Nicholas was making a good respiratory effort. At trial Dr. Iannucci testified that, if Nicholas had been depressed from the Demerol after delivery, he would not have expected to see scores of "2" for muscle tone and reflex irritability.

Before Nicholas was taken from the delivery room, he was given to the plaintiff for "bonding" and was also held by the father. O'Leary testified that babies are not given to the parents to hold unless the babies are stable. According to the plaintiff, Nicholas "looked fine." The father held Nicholas for a few minutes and agreed that he looked fine; he was pink and appeared to be breathing properly.

According to O'Leary, Nicholas was in good condition when he left the delivery room. After the bonding, a nurse's aide transported Nicholas to the nursery. The father accompanied the aide and Nicholas down the hall to the nursery. As they approached the nursery, the father noticed that Nicholas' face was turning blue; Nicholas was making motions with his mouth and moving his arms and legs under a blanket.

Nurse Kosteroski admitted Nicholas into the nursery at 10:30 a.m. Nicholas' heart rate was within normal range, his respiratory

rate was 36 (normal range is between 30 to 60), his temperature was subnormal, muscle tone was fair, and his skin color was "cyanotic." Skin color and the respiratory rate indicated that Nicholas was receiving poor oxygenation of his blood. Kosteroski placed him in the "special care" section of the nursery due to his color. She deep suctioned for small amounts of mucous and fluids, using a catheter. The heart rate was 134 and his respiratory rate was 34 (with some retracting and pulling). According to Kosteroski, Nicholas was not going to sleep and did not appear narcotized. She placed him on an "Ambu bag" with a mask, which was set at 40% oxygen. An "Ambu bag" is attached to a wall unit which supplies ordinary air (21% oxygen) or 40% or even 100% oxygen. It can be attached to a mask or endotracheal tube and the rate, pressure and other parameters are established by manual operation of the bag. After Kosteroski administered the oxygen, Nicholas showed some improvement in color. She described his color as "very pale," but his condition did not improve to what she expected (he was still struggling to breathe). By 10:45 a.m., his color slightly improved to "pale," but the muscle tone was floppy and the heart rate decreased from 134 to 86. Nicholas was then placed in an incubator.

Kosteroski placed an emergency summons for Dr. Iannucci because Nicholas was in distress, was not improving and she needed help. She also placed a call to Dr. Marjorie Prombo, the designated pediatrician, and to Dr. Moon Kim, a neonatologist. Dr. Iannucci, who was on the same floor, was the first to arrive at about 10:45 a.m. He took charge of Nicholas and remained in charge until Dr. Kim arrived. Dr. Iannucci had never resuscitated a newborn in the nursery but had experience resuscitating infants in the delivery room. When he arrived, Nicholas was cyanotic and his heart rate was down to 40 to 60 beats per minute; he appeared to be floppy and barely breathing. Dr. Iannucci intubated Nicholas with an endotracheal tube and used the Ambu bag with 100% oxygen. After he intubated him, he suctioned. After attaching the Ambu bag, he periodically listened and observed Nicholas to make sure that his lungs were expanding on both sides.

Dr. Iannucci decided not to give Narcan, the antidote for narcotic-induced respiratory depression, because there had been no indication in the delivery room of narcotization or respiratory depression or that Nicholas needed resuscitation. According to Dr. Iannucci, Nicholas appeared normal and no resuscitation had been performed in the delivery room except for the usual suctioning. Dr. Iannucci also thought that the sudden change in the child's condition was inconsistent with a diagnosis of narcotization. He was aware that Kosteroski

had been using the Ambu bag with Nicholas and that, if he was suffering from respiratory depression (secondary to narcotics), he should have responded to the Ambu bag treatment. According to Dr. Iannucci, once he intubated Nicholas and reattached the Ambu bag with 100% oxygen, Nicholas should have responded immediately if this was a case of Demerol-induced respiratory depression. Dr. Iannucci first thought that Nicholas suffered from a congenital heart problem or some other problem with his lungs or heart. Then he thought that Nicholas suffered from a "delayed respiratory distress" problem. His tentative diagnoses were congenital heart disease and persistent fetal circulation secondary to pulmonary disease. Persistent fetal circulation means that the child's circulation system fails to make the transition from fetal circulation (where lungs are not used to oxygenate the blood) to post-fetal circulation (when the lungs are first used). The condition of persistent fetal circulation does not respond to oxygen therapy.

Dr. Iannucci did not think Demerol caused or contributed to Nicholas' condition because Nicholas showed no signs of a typical case of respiratory depression due to medication. Nicholas' condition deteriorated over 30 minutes after delivery. Dr. Iannucci testified that in his experience, narcotized babies are slow to develop sustained, rhythmical breathing; they usually do not cry; and they are sleepy. Nicholas did not share these characteristics because his Apgar scores were "8" at the one-minute and five-minute intervals. Even if narcotization is delayed, it usually is apparent at the five-minute Apgar interval, because after the adrenaline from the birth process decreases, the baby's respiration tends to drift off slowly between the one- and five-minute Apgar scores.

Louis Davlantis, a certified and registered respiratory therapist, was summoned and arrived shortly before 11 a.m. He placed Nicholas on the ventilator at 11 a.m. with 60% oxygen and set pressure, inspiratory/expiratory ratio, rate and flow gauge per Dr. Iannucci's order. The flow was set to compensate for a minimal "air leak," *i.e.*, air returning from the lungs along the outside of the tube; such a leak is desirable for a newborn. Davlantis listened to Nicholas' breath sounds and watched his chest rise and fall. There was no improvement in Nicholas' color. At 11 a.m., Dr. Iannucci ordered adrenaline and Atropine and the heart rate increased to over 100. A chest X ray was ordered at 11:07 a.m.

At 11:02 a.m., Dr. Marjorie Prombo arrived and examined Nicholas. His color had returned to cyanotic and his nail beds were dark. At 11:05 a.m. he was "gaspy"; he was making a respiratory drive effort separate and apart from the ventilator machine. Cardiac and respiratory monitors were attached and the heart rate was 107.

Dr. Prombo was in the nursery for eight minutes when Dr. Kim arrived and took charge at 11:10 a.m. (Dr. Iannucci left about 10 minutes later.) Dr. Kim discussed the labor and delivery with Dr. Iannucci upon arrival. He also learned that the plaintiff had been given 25 milligrams of Demerol 37 minutes before delivery.

Dr. Kim first learned that Demerol was an obstetrical analgesic when he was a pediatric resident. Prior to March 1982, he read the 1982 package insert or PDR for Demerol, which contains "indications," i.e., what the drug can be used for, and "contraindications," i.e., how the drug should not be used. Although not an obstetrician, he needs to know about drugs given to the mother so that he can treat a baby who might have a drug-related problem. He knew that (1) Demerol, when used as an obstetrical analgesic, crosses the placental barrier and can produce depression of respiratory and psychological functions in the newborn; (2) Demerol is a narcotic analgesic and the major hazards include respiratory depression and circulatory depression (to a lesser degree), and that respiratory arrest, shock, and cardiac arrest have occurred; (3) when used as an obstetrical analgesic, the usual dose of Demerol is 50 to 100 milligrams given intramuscularly or subcutaneously; and (4) if Demerol is given intravenously, it should be given slowly and diluted or given in a reduced dosage. He also knew that the primary treatment for narcotic-induced respiratory depression is to reestablish an adequate respiratory exchange through a patent airway and assisted ventilation. He knew that the antagonist (or antidote) for Demerol was Narcan (naloxone hydrochloride) and that an appropriate dose should be administered simultaneously with respiratory resuscitation (primarily by the I.V. route).

Dr. Kim's opinion was that Nicholas was not suffering from respiratory depression and specifically not respiratory depression caused by the use of Demerol. He based this opinion on (1) the history; (2) the Apgar scores; (3) the fact that Nicholas did not appear to be suffering from respiratory depression at the time of delivery; (4) the dosage of Demerol; and (5) the fact that Nicholas did not exhibit respiratory problems until after delivery. He opined that Nicholas' problems were not related to the Demerol and saw no reason to administer Narcan.

When Dr. Kim arrived in the nursery, Nicholas was suffering respiratory distress and serious shock. His color was cyanotic. Dr. Kim ordered 100% oxygen from the ventilator and changed the inspiratory/expiratory rate from 1/1.5 to 1/1.1. He checked the position of the endotracheal tube and pulled it back a bit, then taped it in place. He also obtained an X ray to make sure that the tube was

in the correct position. The X ray was taken at 11:40 a.m. It confirmed that the tube and arterial umbilical line were in the correct position and that the lungs were being filled with oxygen. The X ray also indicated hyperaeration, demonstrating that the oxygen mixture from the tube was travelling through his lungs. Even though Nicholas' lungs were filled with oxygen, the blood gasses indicated that oxygen was not getting into the blood. He placed an arterial umbilical I.V. line at 11:20 a.m. so that blood samples could be taken, and so that medications and fluids could be administered. At 11:30 a.m., Nicholas' respiratory rate was 38, his heart rate was 168, and Kosteroski noted that he was warm.

At 11:55 p.m., Nicholas' color improved; he appeared more pink. Dr. Kim continued to check the aeration by listening and observing chest movement. At 12:18 p.m., Nicholas' color was "terrible again" and cyanotic, according to Kosteroski. Dr. Kim removed him from the respirator, used the Ambu bag (but there was not much change in color) and then reconnected him to the ventilator.

From the time of Dr. Kim's arrival, Nicholas was breathing on his own or with assistance. At times, he was gasping on the respirator. Gasping is an indication that the baby is struggling to breathe and that the respiratory drive is still working. Dr. Kim continued to work with Nicholas until shortly after 1 p.m. when the Rush team arrived and assumed the care of Nicholas. Dr. Kim briefed the Rush team and informed them of the administration of Demerol to the mother.

As part of the transfer to Rush, arrangements were made to have a copy of Nicholas' charts made (including the labor and delivery progress summary) and given to the Rush transfer team. Nicholas remained at Rush for approximately 3 1/2 to 4 weeks. Rush determined that during the first few hours after his birth, Nicholas suffered from a condition known as persistent fetal circulation of unknown etiology. As a result, he suffered from cerebral palsy.

We will discuss the evidence involving the claim against each defendant individually. The first claim will be that against the defendant, Winthrop, the manufacturer of Demerol. The plaintiff's claim against Winthrop is based on the allegation that Winthrop's label on Demerol failed to warn of the dangers of the administration of Demerol.

Dr. Zane Brown, the plaintiff's expert, gave the opinion that, although Demerol is a drug that is not unreasonably dangerous, the labeling did make it hazardous to obstetrical patients. He said that the label was inadequate because (1) it did not specify an intravenous dosage that should be given when a woman is in labor; (2) it gave no

description of the pharmacokinetics of the drug regarding its entry into the mother and then the baby (and its metabolization); (3) it did not apprise the doctor that a newborn baby may initially have good Apgar scores and then the baby could still "crash"; (4) it did not say how or how much of the antagonist, Narcan, to administer; (5) it did not specify the dosage of Narcan that might have to be repeated; and (6) it did not explain that resuscitation of a baby is different from that of an adult.

Although Dr. Brown made numerous criticisms of the label, on cross-examination, serious questions of his qualifications were raised. He admitted that he never participated in a labeling program; that he had no knowledge of regulations of the Food and Drug Administration (FDA) concerning the marketing and labeling of drugs, the development of a package insert or its placement in the Physicians Desk Reference Book (PDR);[2] that he did not know whether the FDA would permit a drug company to put a recommended dosage of Narcan in the Demerol package insert or if the FDA would permit pharmacokinetic information on the label; that he was not qualified to say what should be put on the label; and that he was not an expert on labeling.

On cross-examination Dr. Brown also said that he was not qualified to say what should go into a package insert, but that he just needed to know the specifics that he read in the PDR. The attorney for Winthrop then read Dr. Brown's answer at his deposition:

> "I don't think I am qualified to give you an opinion as to what should be included in the package stuffer or what shouldn't be included in the package stuffer. I mean, there [are] professionals that write that and have strong guidelines as to what should be included."

Dr. Brown knew nothing about FDA regulations concerning drug labeling, was not an expert in pharmacokinetics, had no experience with the use of Demerol since 1977 and had never written any articles or conducted any research on Demerol. More importantly Dr. Brown conceded that no report or study had ever stated that 25 milligrams of Demerol is likely to create (or is a sufficient dose) to cause the respiratory problems that Nicholas encountered after birth.

Another expert called by the plaintiff, Dr. Philip Walson, testified that the label should have stated: "If any signs of narcotic effect are seen in the newborn, give Narcan." He also said that the onset and recognition of the onset of the narcotic effect may not be present in

---

[2]The Physicians Desk Reference Book is a compilation of package inserts and includes the Demerol insert.

the delivery room but could later occur after the infant left the delivery room. (This is the "masked effect.") On cross-examination Dr. Walson admitted that he did not do any research on Demerol as an obstetrical analgesic. He agreed that articles from various studies reported that 50 milligrams of Demerol given intravenously within one hour of delivery found no observable signs and little likelihood of respiratory depression in the newborn. He did not know whether the same recognized text, to which he referred on direct examination, made any mention of a delayed onset of respiratory depression. He did not publish any article on the same subject. He also agreed that the Demerol label did not state that respiratory depression cannot occur if the Apgar scores are good or that it could occur within a particular time. Dr. Walson also said that persistent fetal circulation has no cause, is not drug-induced and rarely responds well to any treatment.

Dr. Sol M. Shnider was called as an expert on behalf of Winthrop. He is board-certified in anesthesiology and began to specialize in obstetrical anesthesiology in the late 1950's. He had done extensive research in the area of obstetrical anesthesia and analgesia, including studies on the effects of Demerol on the mother and fetus. He had never read any articles or textbooks that state that 25 milligrams of Demerol given to the mother could cause respiratory depression in the newborn. He explained that the so-called "delayed effect" of Demerol was not a delay in onset but a question of a delay from the time of administration of the drug to the mother to the time of delivery. Where the drug is given one to four hours before the delivery, it accumulates in the baby's system, resulting in some instances in respiratory depression at birth; if the same dosage is given less than one hour before the delivery, it does not result in respiratory depression at birth.

It was his opinion that the package insert for Demerol was adequate and informed and warned physicians who used Demerol of the potential risk to the mother, fetus and newborn child, that it adequately warned about respiratory depression of the newborn after it was in obstetrics and that the insert did not cause or contribute to the condition of Nicholas. It told doctors that Demerol both causes or could cause respiratory depression, that resuscitation may be required and that an antidote may be necessary. It also listed and warned of possible side effects of Demerol. He agreed that the page insert did not warn of a "delayed effect" because "a delayed effect doesn't exist."

■ We believe that the jury did not act unreasonably when it apparently accepted the opinion of Dr. Shnider and rejected the

opinions of Dr. Brown and Dr. Walson. For that reason, we conclude that the verdict of the jury on behalf of Winthrop was not against the manifest weight of the evidence.

The plaintiff alleged two acts of negligence against Dr. Kim: the failure to reintubate Nicholas because the endotracheal tube was an inappropriate size, and the failure to give Narcan. Dr. Brown and Dr. Marcus Hermansen, another expert called by the plaintiff, criticized Dr. Kim for leaving an inappropriately small endotracheal tube in place. Both Dr. Brown and Dr. Hermansen agreed that if ventilation is being accomplished, the size of the endotracheal tube is of no import. The evidence established that ventilation was being accomplished; the X ray showed radiolucent lungs that were filled with air. Thus, the endotracheal tube that was in place was aerating the lungs. Dr. Hermansen also conceded that Narcan was not necessary because Nicholas was already on a ventilator when Dr. Kim arrived in the nursery. So long as the lungs were being aerated, Narcan was not needed.

■ Dr. Henry Mangurten, an expert called by Dr. Kim, testified that Dr. Kim complied with the standard of care, that he did not cause Nicholas any harm and that every step Dr. Kim took helped Nicholas. Again we conclude that the jury was justified in accepting the testimony of a defendant's expert and rejecting those of the plaintiff. The verdict in favor of Dr. Kim is not against the manifest weight of the evidence.

■ The plaintiff's charge of negligence against Dr. Prombo and her medical group, Flossmoor Commons Pediatrics, Ltd., was based on allegations similar to those made against Dr. Kim: Her failure to change the endotracheal tube and her failure to administer Narcan. Dr. Prombo was in the nursery for approximately eight minutes. She obtained a full history, and after she physically examined Nicholas, Dr. Kim entered the nursery and took charge. Dr. Prombo did not give any orders when Dr. Kim took over the care of Nicholas. She also presented an expert, Dr. Richard Burnstine, who testified that Dr. Prombo did not violate the standard of care. He testified that it was reasonable for Dr. Prombo not to have taken charge of Nicholas because the tube was put in and the drugs were administered immediately before she arrived in the nursery. Since there was nothing about the care that was being rendered that would require a pediatrician to correct, there was no reason for Dr. Prombo to usurp the authority of the doctor in charge of Nicholas. The verdict of the jury in favor of Dr. Prombo was not against the manifest weight of the evidence.

The plaintiff's allegations of negligence against St. James

Hospital were based on allegations against Nurses O'Leary and Kosteroski and the respiratory therapist Davlantis. The plaintiff alleged that O'Leary's conduct deviated from the standard of care in three respects: (1) when she administered Demerol to the plaintiff intravenously, she failed to first receive a specific order from Dr. Iannucci to do so; (2) she allowed Nicholas to become hypothermic; and (3) she failed to verbally communicate to the nursery room staff that the plaintiff had received Demerol before delivery.

Dr. Brown testified that O'Leary was required to call Dr. Iannucci before she administered the Demerol. Dr. Iannucci testified that he ordered a single dose for the plaintiff; the order provided that the precise time the dose was to be administered was left to the discretion of the nurse. O'Leary administered the Demerol at 9:30 a.m. following Dr. Iannucci's order. Dr. Iannucci testified that if O'Leary had consulted him at that time he would have ordered the 9:30 a.m. dosage. Even Dr. Tomasi, another expert called by the plaintiff, disagreed with Dr. Brown's criticism of O'Leary; Tomasi testified that the dosage and the manner the Demerol was administered fell within the standard of normal care.

Two defense experts, Dr. Richard Depp and Dr. David Zbaraz, also disagreed with Dr. Brown. Dr. Depp testified that the p.r.n. order was a delegation of authority to administer the drug when she deemed it necessary. Because O'Leary was the nurse during labor, she could determine when the Demerol was needed without first consulting with Dr. Iannucci. Dr. Zbaraz testified that O'Leary complied with the standard of care, considering the stage and level of labor and the advancement the plaintiff was making.

Another allegation against O'Leary was that she allowed Nicholas to become hypothermic. When Nicholas arrived in the nursery (about 30 minutes after delivery) his body temperature was 94.3F. Dr. Brown testified that a newborn's body temperature will not drop if he is properly kept warm; his opinion was that O'Leary violated the standard of care by allowing Nicholas to become hypothermic. The defense, however, points out that Dr. Brown did not suggest how her routine was incorrect. Moreover, the defense experts attributed the decrease in Nicholas' body temperature to reasons other than nursing care.

Dr. Brown criticized O'Leary for allegedly failing to communicate to the nursery staff that the plaintiff had been given Demerol before delivery. However, the fact that the plaintiff had received Demerol was communicated by the labor and delivery summary, which was viewed by all the doctors and staff treating Nicholas in the nursery. Moreover, Dr. Zbaraz testified that O'Leary was not required to

verbally communicate the information contained in the labor and delivery chart because the chart "speaks for itself. It's very clear. It's distinct. There is no question about what went on in the delivery room."

The plaintiff alleged that Kosteroski deviated from the standard of care by improperly auscultating Nicholas' chest while he was in the nursery. (Auscultation is the act of listening to body sounds, for example, heart sounds by use of a stethoscope.) Dr. Hermansen testified that Kosteroski violated the standard of care by improperly auscultating Nicholas' chest and by using 40% rather than 100% oxygen when Nicholas was admitted to the nursery with observed signs of cyanosis and respiratory distress. However, other plaintiff's experts, Drs. Brown and Tomasi, disagreed and testified that 40% oxygen (rather than 100%) was within the standard of care. Another defense expert, Dr. Carl Hunt, also testified that 40% was proper as an initial treatment and that the percentage could then be increased or decreased based on the patient's response. As the defense points out, it was not Kosteroski's sole responsibility to auscultate Nicholas; the entire team was responsible for auscultating and placing the endotracheal tube, according to Dr. Hunt.

The plaintiff alleged that Louis Davlantis violated the standard of care by failing to determine the proper placement of the endotracheal tube by auscultation and by allowing the tube to be left in an improper position. Dr. Hermansen testified in support of the plaintiff's allegation. Davlantis testified that he placed Nicholas on the ventilator at 11 a.m. with 60% oxygen, established the appropriate settings on the ventilator and auscultated Nicholas' chest to insure proper placement of the tube. Even Dr. Tomasi, the plaintiff's expert, testified that Davlantis complied with the standard of care. Dr. Hunt testified that the joint efforts of the resuscitative team complied with the standard of care in determining whether the tube was properly placed. Dr. Hunt also said that the standard of care did not require anything further than the treatment rendered by Davlantis.

■ We agree with St. James that there is ample evidence in the record that supports the jury verdict. Because numerous experts testified that O'Leary, Kosteroski and Davlantis met the acceptable standard of care, the jury was justified in rejecting the "conflicting, unsupported testimony" of the plaintiff's experts. The jury's verdict in favor of St. James and its employees was not palpably erroneous and wholly unwarranted. *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 458 N.E.2d 530.

The plaintiff's next claim is that the defendants caused reversible

error by allegedly violating certain *in limine* orders. As is too often the case, the plaintiff's motions *in limine* were apparently all oral, and the record does not contain all of the oral motions. We will attempt to address the plaintiff's specific claims as best we can.

The first motion apparently sought to bar any attempt by the defense to prove or argue that FDA approval of the Demerol label "relieves the manufacturer of legal duty to adequately warn." The judge allowed the motion. In Winthrop's opening statement its attorney said the following:

> "This particular label in question was approved and set by the Federal Drug Administration. In other words, this is not our label. This is the Federal Drug Administration's label."

During the colloquy that followed, plaintiff's attorney asked that the jury be instructed to disregard the statement and for an instruction at the end of the case. The attorney for Winthrop pointed out that when the label is submitted to the FDA, the FDA has the right to modify, change or do whatever they want with the label. If Winthrop could not comply with the FDA's ruling, Winthrop could not use the label and could not use the drug. He told the judge that he was not saying that Winthrop was "exonerated" because of the FDA approval. The judge expressed the view that Winthrop's attorney should clarify his statement to the jury. When the jury returned, Winthrop's attorney said the following:

> "Ladies and Gentlemen, I would like to clarify one statement I made. The label itself is, in fact, Winthrop-Breon's label. However, this label must be approved in detail by the Federal Drug Administration. So, if I misrepresented I apologize."

■ We do not believe that the attorney's initial statement specifically violated the motion *in limine*. He did not state that Winthrop was relieved of its duty to warn because the FDA approved the label. Even if it could be argued that the statement did violate the judge's order, any error would be harmless because Winthrop's counsel specifically clarified his statement to the jury.

During the opening statement the attorney for Winthrop also said: "So this particular label has, in fact, been approved by the medical profession before the FDA did, in fact, o.k. it." The plaintiff's attorney objected, and Winthrop's attorney then told the jury that the evidence would show that a panel of medical experts consisting of neonatologists, pediatricians, pharmacologists, neurologists and anesthesiologists comprising the National Academy of Sciences had found the particular label to be safe and effective.

■ The plaintiff fails to cite any motion *in limine* that allegedly was violated by Winthrop's attorney's statement. It appears that the

plaintiff's only complaint at trial was that the statement was a "misstatement of the law and facts." Consequently, we refuse to find that any violation of any order *in limine* occurred. We agree with Winthrop's argument that the statement was consistent with the testimony of Wendall Welch, the director of drug regulatory affairs at Sterling, Winthrop's parent corporation, who was questioned during the plaintiff's case in chief.

■ The plaintiff further contends that the reference to the National Academy of Sciences as having "found this label to be safe and effective" in 1970 violated an *in limine* motion which had been presented by Winthrop. Winthrop's motion asked the judge to bar any reference to the contents of the package inserts for Demerol other than for the year at issue, 1982. The plaintiff has failed to show us how the statement of Winthrop's attorney, of which the plaintiff now complains, prejudiced the plaintiff.

The plaintiff contends that Dr. Iannucci's attorney's cross-examination of the plaintiff's witness, Dr. Richard Bennett, involving Nicholas' ability to drive a car violated a motion *in limine*. The defendants moved to bar or limit the testimony of Dr. Bennett regarding the future care, needs and life expectancy of Nicholas on the ground that such testimony was cumulative. The plaintiff's attorney told the judge that Dr. Bennett was not being called to testify in these areas, that Dr. Bennett would be limited to the cause of Nicholas' cerebral palsy. Based on that representation, the trial court denied the defendants' motion to bar Dr. Bennett from testifying.

On direct examination the plaintiff's attorney brought out that Nicholas' condition was permanent. He asked Dr. Bennett if there had been any improvement in Nicholas' condition and, if so, why there had been. The doctor answered:

> "[B]ecause, fortunately, the brain is a wonderfully resilient organ and in many infants who experience an—in fact, in the majority of infants who experience some level of hypoxia they literally can recover with few, if any, deficits. Now, in Nicholas' case, the level of hypoxic ischemia was so great and sustained for a long period of time, by that I mean hours, that he is left with a permanent cerebral palsy. But in many was, it's a great testament to the brain's recovery ability."

■ Winthrop's attorney established that it was possible that Nicholas was not mentally retarded but was of low average intelligence, that his ability to walk is unlikely to improve but will not deteriorate and that it was within his grasp to graduate from high school. We agree with the trial judge's ruling that the direct examination of Dr.

Bennett opened the door for the cross-examination by Winthrop's attorney and there was no violation of an *in limine* ruling. Moreover, on redirect examination, the plaintiff's attorney was able to bring out from Dr. Bennett that it was unlikely that Nicholas would ever be able to live alone and that he would probably require another adult to live with him in a "semi-supervised situation to help him with some of his daily activities." Dr. Bennett later testified on redirect examination that Nicholas had permanent brain damage, that it is to his benefit that "he has such supportive, loyal parents, but it will not make his ability to function in the outside world easier from his disabilities." We find no error in the cross-examination of Dr. Bennett. We especially find that there was no prejudicial error.

■ The plaintiff next maintains that the attorney for Dr. Prombo violated a motion *in limine* barring any reference to the fact that Nicholas' parents would continue to care for him by remarks made by Dr. Prombo's attorney in closing argument. The plaintiff does not refer to any part of the record supporting his claim that a motion *in limine* was made and ruled upon barring any reference to the fact that Nicholas' parents would continue to care for him. Consequently, any assignment of error is waived. (*Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 434 N.E.2d 793.) Further, the record shows that the statement was based on matters which were in evidence; they were not improper.

The plaintiff next contends that Dr. Shnider violated a motion *in limine* by referring to articles of other authors as a basis to support his opinion. Before Dr. Shnider testified, the judge said that Dr. Shnider could not use "the text and so on as substantive or affirmative evidence in his case." It could only be used on cross-examination. He said that he would not permit the doctor to bring in other texts and say that those texts or articles supported his position.

During Dr. Shnider's direct examination he explained his own studies on delayed onset that he had conducted. He also referred to later studies on placental transfer of Demerol by Dr. Morrison and Betty Kuhnert, which repeated his own earlier research and supplemented it.

■ In order for a violation of an *in limine* order to serve as a basis for a new trial, the order must be specific in its prohibitions and the violation must be clear. (*Schaffner v. Chicago & Northwestern Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298, *aff'd* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.) And where a violation is found to exist, a new trial may follow only where the violation has prejudiced the plaintiff or denied him a fair trial. (*Bradley v. Caterpillar Tractor Co.* (1979), 75 Ill. App. 3d 890, 394 N.E.2d 825.) In our

judgment it is not clear that Dr. Shnider's testimony violated the terms of the *in limine* order and we are convinced that, if there was a violation, it did not prejudice the plaintiff or deny her a fair trial.

■ The plaintiff's last complaint concerning a violation of *in limine* orders is based on the trial judge's ruling that post-1982 literature could not be used on the standard of care. The plaintiff maintained that the defendants' attorneys cross-examined Dr. Tomasi, an expert called by the plaintiff, about textbooks which post-dated 1982. Dr. Tomasi was cross-examined about post-1982 occurrence textbooks on the issue of causation, not on the standard of care. Consequently, Dr. Tomasi's cross-examination did not violate any *in limine* order. Moreover, we note that the plaintiff's attorney did not make any objection to the cross-examination of Dr. Tomasi. (*Cf. Cunningham v. Millers General Insurance Co.* (1992), 227 Ill. App. 3d 201, 591 N.E.2d 80 (even denial of motion *in limine* requires objection later to preserve error for review).) In sum, we find that the plaintiff has failed to establish any reversible error through violations of *in limine* orders.

The plaintiff next maintains that the plaintiff was denied a fair trial by alleged personal attacks on the plaintiff's witnesses or the plaintiff's attorney.

During the cross-examination of Dr. Brown, Dr. Prombo's attorney asked him in how many cases he testified for the plaintiff. Dr. Brown answered, "Four or five." He was then asked, "Do you have any more cases with any other lawyer other than that?" He responded, "I have a case with Baker & McKenzie in Chicago, Mr. Donohue's firm." (Mr. Donohue was the attorney for Dr. Iannucci.) On redirect the following occurred:

"PLAINTIFF'S ATTORNEY:
Now, with regard Doctor, to [what] [the attorney for Prombo] *** said d[id] you testify for any other attorneys?
WITNESS:
Yes, sir.
PLAINTIFF'S ATTORNEY: You mentioned Baker & McKenzie?
WITNESS: Yes, sir.
PLAINTIFF'S ATTORNEY: That's the same firm Mr. Donohue is associated with, isn't it?
WITNESS: Yes, sir.
PLAINTIFF'S ATTORNEY: When did the law firm of Baker & McKenzie contact you regarding testifying in any kind of case?
WITNESS: Several years ago.
PLAINTIFF'S ATTORNEY: Are you presently acting in that regard as an expert in that case?
WITNESS: Yes, sir.

PLAINTIFF'S ATTORNEY: What is that case about?

ST. JAMES' ATTORNEY: I object. I don't think that's at all relevant.

MR. DONOHUE: I would object. I don't think that's at all true.

PLAINTIFF'S ATTORNEY: Your honor, I object to that remark. I think that's totally improper.

JUDGE: The jurors will disregard that remark. That comment[ ] will be stricken by Mr. Donohue. I will let the question stand.

* * *

PLAINTIFF'S ATTORNEY: Were you paid by the law firm of Baker & McKenzie?

WITNESS: Yes.

PLAINTIFF'S ATTORNEY: Is that case involving a brain damaged child?

WITNESS: Yes, sir.

PLAINTIFF'S ATTORNEY: Mr. Donohue just said he doesn't think it's true.

ST. JAMES' ATTORNEY: I thought that was just stricken, you Honor?

TRIAL JUDGE: It was. The comment was stricken.

PLAINTIFF'S ATTORNEY: Was it stricken? I am sorry."

Later, Mr. Donohue asked Dr. Brown if the defendant in the case he reviewed for Baker & McKenzie was the University of Illinois, if he was paid for his review, who paid him and whether he ever gave a deposition. Dr. Brown did not give a deposition, he did not recall whether the University of Illinois or Baker & McKenzie or the State of Illinois paid him for his review. We agree with the trial judge's ruling that the matter had been clarified in front of the jury and that the jury understood that the accuracy of the statement made by Mr. Donohue was debatable. The judge said that he would permit the plaintiff's attorney to comment on the matter in final argument but that he would not make any further instruction to the jury. The plaintiff's attorney did make a comment about the fact that Dr. Brown had done work on behalf of the law firm of Baker & McKenzie. He said that "an expert that is worthwhile should be expert, whether he is for you or against you." We judge that no reversible error occurred because of the statement of Mr. Donohue.

The plaintiff next maintains that reversible error occurred during the closing argument of Winthrop's counsel in which he referred to Dr. Zane Brown as the "Zanester." We agree that any error was waived because the plaintiff's attorney failed to make a contemporaneous objection. (*Daniels v. Standard Oil Realty Corp.* (1986), 145 Ill. App. 3d 363, 495 N.E.2d 1019.) In addition, the plaintiff failed to

include this alleged error in his post-trial motion. Finally and briefly, we believe this claim has no merit.

Dr. Brown testified that he read some articles sent to him by plaintiff's attorney that "really impressed [him]." The following occurred during the cross-examination by Winthrop's attorney:

> "WINTHROP'S ATTORNEY: And can I again show you Winthrop Exhibit No. 4, March 14. Where does the opinion on the articles appear in that document?
>
> WITNESS: It does not.
>
> WINTHROP'S ATTORNEY: Did you make those statements to impress your employer this morning?
>
> PLAINTIFF'S ATTORNEY: Objection to 'employer.' I don't know—
>
> WINTHROP'S ATTORNEY: He is working for you.
>
> PLAINTIFF'S ATTORNEY: Your Honor, I object to [Winthrop's attorney's] remarks. These are improper.
>
> TRIAL JUDGE: The jury will disregard the comments. They will be stricken. You may ask your next question."

The brief comment by Winthrop's attorney, though improper, was stricken and the jury was admonished to disregard it. Any error was minimal, and it was immediately cured by the trial judge.

■ The plaintiff also complains of another question about Dr. Brown's claim of membership in a professional organization. Dr. Brown testified that he was a member of the "Society of Obstetrical Anesthesiologists and Perinatologists." Winthrop's counsel then showed him a roster of members, on which Dr. Brown's name did not appear. Dr. Brown admitted that he had not paid his dues for the past two years. The plaintiff did not object to this line of questioning. Therefore, any alleged error is waived. Waiver aside, this claim also has no merit.

During the examination of Dr. Shnider by a defense attorney, he was asked about the size of the endotracheal tube. The doctor was asked to explain how "those small muscles" of Nicholas might have relaxed in the following couple of hours. During his answer the doctor said:

> "And if I would put a number four endotracheal tube down [the plaintiff's attorney's] throat and I squeezed the thing, I would have an enormous air leak and I could not get air into [the plaintiff's attorney's] with a number four tube."

The plaintiff now maintains that this testimony was reversible error. Again, no contemporaneous objection was made. Indeed, the record shows that the plaintiff's attorney laughed at the remark. We repeat that, waiver aside, this claim has no merit.

The plaintiff also maintains that the "jury was permitted

numerous allusions to the proper wealth of plaintiff's counsel." The plaintiff cites to a sidebar where the plaintiff's attorney stated that "[Dr. Iannucci's counsel] talk[ed] about the wealth of the plaintiff and the plaintiff's attorney making more money than he did and does [Winthrop's attorney]." The only part of the record that we have found that could possibly bear on this question occurred during the examination by the plaintiff's attorney of Dr. Shnider in which the plaintiff's attorney told Dr. Shnider that he had bought a copy of Dr. Shnider's book. Needless to say, any objection to the testimony of Dr. Shnider was waived. No error occurred in Dr. Shnider's testimony.

Finally, the plaintiff's attorney alleges that prejudicial error occurred during the following closing argument:

"PLAINTIFF'S ATTORNEY: [Dr. Bennett] told you, ladies and gentlemen, and I found interesting for [Winthrop's attorney] to say he has no experience, he is not an expert, he [Dr. Bennett] told you that in his experience while he was in the service he had five cases of children whose mothers were given Demerol 25 milligrams I.V. that he personally cared for.

WINTHROP'S ATTORNEY: Object. He did not testify to that.

ANOTHER WINTHROP ATTORNEY: Exactly.

PLAINTIFF'S ATTORNEY: I resent this kind of—

TRIAL JUDGE: Why don't we have—

WINTHROP'S ATTORNEY: Tell the truth then.

PLAINTIFF'S ATTORNEY: I object to that as well, your Honor.

TRIAL JUDGE: The jurors will disregard the comments. Let's come out here for a moment."

Out of the presence of the jury, Winthrop's attorney argued that plaintiff's attorney had misstated the evidence eight times during argument and the judge had to order the jury to disregard it each time. The plaintiff does not dispute that statement.

■ This was a hotly contested and well-tried case on both sides. While we do not condone the statement made by Winthrop's attorney, we cannot believe it affected the jury's verdict. The judge's ruling effectively removed the sting from the remark.

■ The plaintiff also maintains that St. James' counsel made prejudicial remarks during closing argument in which he said that the defendants "who cared for Nicholas" cared "a lot about what happened to this child." He concluded by saying that a verdict against them tells the "profession good care isn't enough" and that they were going "to have to pay the price." The plaintiff's attorney did not object to this comment. Consequently any alleged error is waived. (*Daniels v. Standard Oil Realty Corp.* (1986), 145 Ill. App. 3d 363, 495 N.E.2d 1019.) In addition, we find no prejudice in these remarks.

The plaintiff next contends that the defense attorneys were

permitted to question Dr. Walson about Sudden Infant Death Syndrome (SIDS), "despite the fact that there was no expert testimony that SIDS was an issue in this case."

During the cross-examination of Dr. Walson, Winthrop's attorney asked if there were any similarities in the etiologies of SIDS and cerebral palsy. Over objection by the plaintiff, Dr. Walson testified that SIDS was a syndrome "where a baby dies *** without an identifiable cause." The trial judge said that some of the questions on alternate causes could be cleared up on redirect examination. On redirect examination the plaintiff's attorney asked the doctor whether this case had "anything at all to do with SIDS," and Dr. Walson answered, "Absolutely not."

■ Thus, the plaintiff's attorney was able to dispel any suggestion in the minds of the jury that Nicholas' condition might have been related to SIDS. We agree that there was no violation of Supreme Court Rule 220 (134 Ill. 2d R. 220) because Winthrop's attorney was permitted to ask Dr. Walson about alternate causes of Nicholas' injury; causation was the subject of his expert opinion.[3] In any event, any harm from raising the issue was dispelled on the redirect examination.

The plaintiff next maintains that error occurred during the cross-examination of Dr. Hermansen by Dr. Prombo's attorney, who asked questions about other defendants' conduct. Although it is difficult to determine the basis of the plaintiff's claim here, it appears that her attorney objected to volunteered responses by Dr. Hermansen. These responses were outside the control of any defense counsel. If Rule 220 were applicable and if the responses were in violation of Rule 220, the volunteered answers of Dr. Hermansen criticized Dr. Iannucci. The plaintiff did not suffer any prejudice; rather, the criticisms of Dr. Iannucci only benefited the plaintiff.

■ The plaintiff next contends that Dr. Depp's testimony about a link between the drug Sudafed and persistent fetal circulation was speculative. Dr. Depp had testified that the plaintiff had a cold and took some Sudafed before delivery. The doctor said that he was not sure that it had been proved that Sudafed had an effect on the vasoconstriction of the vessels which could lead to persistent fetal circulation. After a sidebar the trial judge ruled that the question and answer be stricken. He also instructed the jury to disregard Dr. Depp's answer. We find no prejudicial error occurred in the examination of Dr. Depp.

---

[3]We will discuss the applicability of Rule 220 to cross-examination of an expert later.

■ Dr. Carl Hunt, an expert called by St. James, testified that he had reviewed the X-ray reports and that he had "seen the X-ray itself." At a sidebar the plaintiff's attorney argued that Dr. Hunt had never reviewed the actual X rays, but only the X-ray reports. The trial judge instructed the defendant's attorney to restrict his examination to the X-ray reports and that he would not permit Dr. Hunt to give an interpretation of the X rays if he had not reviewed them before he testified. St. James' attorney then limited inquiry to the X-ray reports that had been used by Dr. Hunt and had been disclosed pursuant to Rule 220. The plaintiff now contends that Dr. Hunt's testimony was reversible error. We disagree. Any potential error was immediately cured by the subsequent examination.

The plaintiff also maintains that Dr. Hunt improperly testified about "risk factors," again an alleged violation of Rule 220. The question posed by St. James' attorney to Dr. Hunt was:

"[W]hat, if anything, else do you find in the record that provides support that there may have been intrauterine stress on this newborn that caused the increased vasculature that he referred to?"

The plaintiff's attorney immediately objected and argued that Dr. Hunt did not have any opinions on other risk factors. St. James' attorney answered:

"I don't understand what you mean by risk factor. The question was asked in his deposition, is there any other signs [sic] that would be consistent with the fact that something may have gone on in utero that is not a risk factor."

The trial judge overruled the plaintiff's objection. The record on appeal does not contain Dr. Hunt's deposition testimony. If the deposition did not contain what St. James' attorney alleged it contained, it was the obligation of the plaintiff to present that deposition on appeal. The plaintiff has not presented a sufficient record on appeal to preserve this issue for review.

■ The plaintiff also contends that Winthrop's attorney asked questions of Dr. Hermansen on cross-examination which exceeded the scope of his Rule 220 answers to interrogatories and the opinions he expressed in his deposition by asking him about a treatise written after 1982. This issue is identical to the alleged motion *in limine* violations. For several reasons this issue is without merit. First, the plaintiff's attorney did not contemporaneously object; thus, any error is waived. Second, there is no cite to any deposition testimony to support the claimed error that the use of the text exceeded the scope of Dr. Hermansen's Rule 220 answers to interrogatories and deposition testimony. Finally, the trial judge ruled that post-1982 texts

could be used on the issue of causation, not standard of care. The text referred to was used to demonstrate that there were 21 causes of neonatal apnea (cessation of breathing over 20 seconds) and that Demerol was not mentioned. Thus, the use of the text did not violate any *in limine* order and was not error.

Before leaving this point we deem it appropriate to express a question of the applicability of Rule 220 to the cross-examination of Dr. Hermansen (and other plaintiff experts), although the defendants make no issue of it. The pertinent provision of Rule 220 is as follows:

"(d) Scope of testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, *his direct testimony at trial* may not be inconsistent with nor go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." (Emphasis added.) 134 Ill. 2d R. 220(d).

We read Rule 220 to be a limitation on the party calling the expert as a witness. It was designed to prevent surprise. We do not read it to mean that the opposing party would be restricted from asking questions which were otherwise relevant because an expert witness had limited his answers to interrogatories or whose discovery deposition might have been limited. In this case, there was a general order *in limine* that *all* parties would be prevented from asking questions of *any* expert witnesses concerning the use of post-1982 texts for anything other than opinions on causation. But that is another matter; the *in limine* order did not involve Rule 220.

The plaintiff's last claim of error is that the trial judge erroneously refused to give an instruction she requested. Winthrop filed its answers to the plaintiff's Rule 220 interrogatories, naming 11 potential expert witnesses. Later Winthrop filed amended Rule 220 answers naming eight potential expert witnesses. On the date set for trial, Winthrop moved for leave to withdraw seven experts including three out of the eight named in its amended Rule 220 answers; the reason for the withdrawal was that the witnesses were not produced for discovery depositions due to the discovery schedule. Winthrop also filed a second amended Rule 220 answer, listing its five remaining experts. At trial St. James requested leave of court to withdraw Dr. Murphy from its witness list; the trial judge granted the request.

At the jury instructions conference, Winthrop's attorney informed the judge that he did not intend to call Drs. Ostheimer,

Donn and Raines because their testimony was cumulative; those doctors had been included in the last answer to interrogatories filed by Winthrop. The plaintiff's attorney subsequently requested that the trial judge tender Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d); he argued that the jury could draw unfavorable inferences from missing hospital records, the failure of Winthrop to call Doctors Ostheimer, Donn and Raines and the failure of St. James to call Dr. Murphy.

IPI Civil 2d No. 5.01 instructs the jurors that if a party fails to produce a witness "within his power[s] to produce" the jurors may infer that the testimony or evidence would be adverse to that party if the witness was under the control of the party and could have been produced by the exercise of reasonable diligence; the witness was not equally available to an adverse party; a reasonably prudent person under the same circumstances would have produced the witness if he believed the testimony or evidence would be favorable to him; and no reasonable excuse for the failure has been shown. The giving of IPI Civil 2d No. 5.01 rests in the sound discretion of the trial judge, and reviewing courts will reverse only when a clear abuse of discretion is demonstrated. Before giving the instruction, the trial judge must determine whether, in all likelihood, the party would have produced the witness under the facts and circumstances of the case unless the testimony would be unfavorable. If the witness' testimony would be cumulative of facts already established, the instruction is not warranted. (*Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 549 N.E.2d 1295.) The instruction should not be given if the evidence is equally available to either party or if the party has provided a reasonable excuse for the nonproduction or willful withholding of the evidence. *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, 520 N.E.2d 852.

In this case, Winthrop does not dispute that the witnesses were within Winthrop's control; Winthrop's only argument is that they were cumulative. The plaintiff, on the other hand, does not dispute that the witnesses were equally available to her; she maintains that the doctors' testimony was not cumulative. We will, therefore, confine our analysis to the issue as it has been presented to us: Was the testimony of the three doctors cumulative? At this point, it is the obligation of the plaintiff to show that their testimony was not cumulative.

Some cases have dealt with the instruction where a party fails to call an expert witness. In *Schaffner v. Chicago & Northwestern Transportation Co.* (1989), 129 Ill. 2d 1, 541 N.E.2d 643, the trial judge refused to give the instruction but permitted the party who

offered it to comment adversely on the absence of a witness allegedly under the control of a codefendant. The supreme court held that under the circumstances the argument was proper. We judge that the supreme court implicitly held that the instruction should have been given.

In *Wetherell v. Mattson* (1977), 52 Ill. App. 3d 314, 367 N.E.2d 472, the jury was not given the instruction. We are unable to determine whether the instruction was ever offered. But the appellate court held that prejudicial error occurred when the defendant's attorney sought to create an adverse inference in the minds of the jurors by referring to the absence of a doctor who had treated the plaintiff. On appeal the defendant argued that the requirements for giving IPI Civil 2d No. 5.01 are "different, and presumably greater, than the permissible scope of comment during closing argument in this regard." (*Wetherell*, 52 Ill. App. 3d at 318-19.) The appellate court disagreed and said:

> "To accept defendant's argument would require plaintiff to produce every doctor who treated him or be faced with defendant's insinuations that other, later treating physicians, would have testified adversely." 52 Ill. App. 3d at 319.

In *Betts v. Mannville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 588 N.E.2d 1193, the appellate court upheld the refusal to give IPI Civil 2d No. 5.01 after the defendant failed to call disclosed expert witnesses. The court said:

> "We decline to require every party to produce every expert it lists as a possible witness in order to avoid the unfavorable inference instruction." 225 Ill. App. 3d at 901.

In *Van Steemburg v. General Aviation, Inc.* (1993), 243 Ill. App. 3d 299, 611 N.E.2d 1144, the appellate court held that error occurred when the trial court refused to give the instruction where a party failed to call an expert.

We believe that, when a party fails to call an expert witness, considerations are involved in the decision whether to give IPI Civil 2d No. 5.01 that are rarely present in instances involving other witnesses. A rule that penalizes a party for failure to call expert witnesses whom the party has previously identified has disturbing and possibly unfair ramifications. If a party does not disclose an expert witness, Rule 220 may bar the witness. If a party does disclose an expert witness but does not call the witness to testify, he may be penalized by damaging instructions. It would seem to be the safer option for the party to call all the witnesses previously disclosed. Calling all previously disclosed expert witnesses would not only be unnecessarily expensive in many cases, but it could also unnecessar-

ily prolong the trial. It is our view that the instruction should not be given where expert witnesses are not called unless adverse parties clearly show that they are entitled to the instruction. We turn now to the question of whether the trial judge abused his discretion in refusing the instruction.

Dr. Ostheimer's answer to the interrogatory was that Demerol did not cause or contribute to the respiratory distress or depression suffered by Nicholas; the warning for Demerol was proper and adequate; the answer also identified various causes of Nicholas' respiratory problems. Dr. Donn's answers were very similar to Dr. Ostheimer's. Dr. Raines' answer was that the warning for Demerol was proper and adequate.

We have examined the lengthy arguments made by the plaintiff that the testimony of the doctors would not have been cumulative and, most important, the argument that the testimony of the doctors would have contradicted Winthrop's expert, Dr. Shnider. Winthrop properly points out that a substantial portion of the plaintiff's argument on this point is directed to possible conflicts between the opinions of the three doctors not called by Winthrop and experts called by defendants other than Winthrop. The issue, therefore, boils down to whether the experts not called would have contradicted the testimony of Dr. Shnider. In substance, Dr. Shnider's testimony was that Demerol did not cause or contribute to Nicholas' condition and that Winthrop's package inserts adequately warned all users of Demerol.

In the plaintiff's reply brief, she maintains that "Drs. Ostheimer, Donn and Raines had offered testimony in their depositions which was adverse to the position of the *defendants*." (Emphasis added.) She does not cite to any part of Dr. Shnider's testimony which was contradicted or weakened by the depositions of Dr. Ostheimer or Dr. Donn. With regard to Dr. Raines, the plaintiff argued in the trial court that Dr. Raines testified

> "that the antidote of Narcan can be used both for overdosage as well as in regularly for dosages that are considered regular. That would have been testimony which would have been in keeping with the plaintiff's case and which would have been contrary to the position taken by defendant."

■ We assume that when the plaintiff's attorney said "defendant," he was referring to Winthrop. In the plaintiff's brief, the only references to Narcan in Dr. Shnider's testimony are pages 6,828 and 6,829 of the report of proceedings. Those pages of the record contain only Dr. Shnider's opinion that the administration of Narcan was not required because "there was no respiratory depression in the delivery

room." Those pages of the record do not support the plaintiff's claim that Dr. Raines' testimony would have rebutted or weakened Dr. Shnider's testimony. We conclude that the plaintiff has failed to establish that the testimony of the witnesses previously identified by Winthrop was not cumulative.

The plaintiff also maintains that the instruction should have been given because of the failure of St. James to produce the results of a blood gas test and a transfer log and log sheets. The manager of St. James' respiratory services and the director of medical records for St. James testified as adverse witnesses. They established that the hospital requires, when notified of a lawsuit, that medical records "not be destroyed or in anyway altered, changed [or] modified"; and that the blood gas test results be part of a patient's medical records. A fourth blood gas slip was missing from Nicholas' records. Once again we conclude that the trial judge did not abuse his discretion in refusing to tender IPI Civil 2d No. 5.01 with respect to the missing transfer log and log sheets and the fourth arterial blood gas slip. St. James provided a reasonable excuse for not producing the records, *i.e.*, they were lost. But most important, the transfer log and log sheets and the results of the fourth arterial blood gas test were provided to the Rush team, and the Rush team charts were produced at trial. We caution that our holding is not one which permits a party to avoid the impact of IPI Civil 2d No. 5.01 by simply asserting that a record is lost. Some records may be of such importance that it would be unreasonable to accept a party's excuse that the records were lost. We do say, however, that in this case, the plaintiff has failed to show any prejudice resulting from the failure to produce the documents requested.

Because we find that the issues were fairly tried and the jury properly instructed and that the evidence supports the verdict, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.